[Cite as *State v. Kamer*, 2022-Ohio-2070.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                          Court of Appeals No.  WD-20-084

　　　　Appellee                                  Trial Court No.  2019CR0515

v.

Gregory Scott Kamer, Jr.                      **DECISION AND JUDGMENT**

　　　　Appellant                                Decided:  June 17, 2022

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Gregory Kamer Jr., appeals the November 6, 2020 judgment of

the Wood County Court of Common Pleas sentencing him to four consecutive sentences

of life in prison without the possibility of parole, plus 30 months.  Because Kamer was

prejudiced by the trial court admitting other-acts testimony for a purpose not permitted by

Evid.R. 404(B) and improperly admitting numerous incriminating statements through

hearsay testimony—and the state did not prove that these errors were harmless beyond a reasonable doubt—we reverse.

## I.     Background and Facts

{¶ 2} In November 2019, Kamer was indicted on 12 charges related to the sexual abuse of K.K. ("the child"), who was five years old at the time of the offenses. Counts 1, 2, 3, 4, 7, 8, 9, and 10 charged Kamer with rape in violation of R.C. 2907.02(A)(1)(b), each a first-degree felony; counts 5 and 11 charged him with gross sexual imposition in violation of R.C. 2907.05(A)(4), each a third-degree felony; and counts 6 and 12 charged him with disseminating matter harmful to juveniles in violation of R.C. 2907.31(A)(1), each a fourth-degree felony. The charges in the indictment were divided over two periods of time; the state alleged that counts 1 through 6 happened "[o]n or about December 1, 2018 to February 28, 2019[,]" and that counts 7 through 12 happened "[o]n or about March 1, 2019 to July 29, 2019[.]"

{¶ 3} Kamer's case was tried to a jury in October 2020. The state presented the testimony of C.K. ("mother"), the child's mother; the child; Alison Alstott, a social worker; detective Matt Simon of the Lake Township Police Department ("LTPD"); Abigail Grieser, a child abuse investigator from the Wood County Department of Job and Family Services ("JFS"); Alicia Martinez, a sexual assault nurse examiner ("SANE"); and G.K., Kamer's former stepdaughter. Kamer presented the testimony of Dr. Gregory Forgac, a psychologist, and testified in his own behalf. The following facts were adduced at trial.

2.

## A. The state's case

### 1. Mother's testimony

{¶ 4} The state began its case by presenting mother's testimony. Mother testified that, at the time of the events alleged in the indictment, she was in a relationship with Kamer, and they were living at the motel where mother worked. The child, who was mother's child from a different relationship, and a younger daughter ("sibling") that mother and Kamer shared also lived with them. Mother said that the child and Kamer had a good relationship; the child "wanted [Kamer] to be her dad * * *" and "liked the thought of having a dad." From the time that they moved into the motel in November or December of 2018 until approximately February or March of 2019, Kamer watched the children while mother worked her shifts at the motel. After that, mother put the children in daycare, so Kamer no longer watched them while she worked.

{¶ 5} Altogether, Kamer lived with mother and the children in three different rooms at the motel. The first room that they lived in was a "single room with one bed" that was furnished with a king-sized bed, and that mother outfitted with a toddler bed for the child and a pack 'n' play for the sibling. Because of the size of the room, mother said that it was "a lot harder to box off * * *" the children's area like she later did in the larger rooms. Although the children were in the same room as mother and Kamer, mother said that the child never saw her and Kamer having sex. The adults took preventative measures to conceal their sexual activity from the children, including waiting until the girls were asleep to have sex, staying under the covers during sex, leaving the TV on, and

3.

stacking four or five king-sized pillows to create a wall between them and the children. Although mother said that there was a "small chance" that the child might have overheard Kamer telling mother to relax and watch TV while he was performing oral sex on mother, mother did not "believe there would be a way [the child] would have heard it."

{¶ 6} When the family moved into the second, slightly bigger room, mother purchased a cardboard partition "to go in between [the girls'] space and our space just to try to keep somewhat of privacy * * *" and block a direct line of sight from the children's beds to the adults' bed. The child eventually put a hole in the partition. Mother also said that the child had a garbage bag on her mattress that mother could hear when the child got out of bed. Mother insisted that she and Kamer were very careful to conceal their sexual activity from the child and said, by way of example, that she heard the child get up one night while she and Kamer were having sex, and that she and Kamer stopped until the child went back to bed. However, she conceded that if she could hear the child, it was likely that the child could hear her and Kamer, and if the child were awake, she could have heard things that mother and Kamer said. Mother said that the child "[a]bsolutely" did not see mother and Kamer having sex. On cross, though, she acknowledged that, when the child first disclosed the sexual abuse, the child said that "this is what mommy and daddy do" while pantomiming intercourse with naked dolls.

{¶ 7} Regarding the child's disclosure of the abuse, mother said that in August 2019, after Kamer was arrested on a parole violation and no longer lived at the motel, the child went to a family party with her maternal grandfather and step-grandmother. When

4.

mother picked up the child, grandfather and step-grandmother told mother that the child "came out about something that had happened to her[,]" which was that "Gregory"—i.e., Kamer—"was touching her." She elaborated that the child did not want to discuss the allegations "too much" because she did not want to upset mother, but said that Kamer "was touching her down below and that he had put himself halfway inside of her." Mother said that the child referred to the touching as a "secret game" that she and Kamer played, and when Kamer called from jail that night, mother told him that the child "couldn't wait to play their secret game. [Kamer] like kind of chuckled and said, 'Oh, she's so silly.'" After that, mother remembered "going off" on Kamer.

{¶ 8} The day after the child's disclosure of the abuse, mother took her to the hospital for an examination. According to mother, someone was going to "open a case and look into all of it * * *" because the things that the child reported during the exam were "too alarming to having [sic] just seen anything."

{¶ 9} As a result of the child's disclosures, the LTPD and JFS opened investigations of the matter. Grieser, the JFS worker who conducted the forensic interview of the child, spoke with mother after the interview and showed mother the pictures that the child drew. At trial, the state presented the drawings as an exhibit. One of the drawings was a picture that the child said was Kamer's penis. Mother thought that the picture was significant because of the "lines that [the child] drew in it." Mother explained that Kamer is "un-circumcised and it looks like his penis has lines in it."

5.

{¶ 10} Over Kamer's objection, the trial court allowed mother to testify to the specifics of the abuse that the child disclosed to mother. According to mother, the child reported that Kamer "put her in bed and let her watch his phone, told her to relax, and he did perform oral sex on her." Mother said that Kamer also used to tell mother to "'[r]elax, watch TV'" when he would perform oral sex on her. Additionally, the child disclosed a time when Kamer "took her into the bathroom and white stuff came out of the tip of his penis—gooey white stuff."

{¶ 11} Mother went on to testify about the child's history of telling lies and making up stories. On direct, mother said that the child "would tell white lies—just like any five, six year old" about things like throwing away garbage or going to the bathroom before bed and that mother wanted the allegations of abuse "to be another one of them." A couple of days after taking the child to the hospital, mother was talking to the child and trying to get the child to "tell me it didn't happen. * * * I wanted to hear her say she made it up. And she didn't. She was on the ground saying, 'Mom, I swear he did it.'" The "he" the child referred to was Kamer. Although mother initially thought that the child was changing her story about the abuse, she eventually realized that the child was disclosing additional instances of abuse.

{¶ 12} The child's history of lying is what made mother initially disbelieve the child's disclosures about the sexual abuse. However, the child was in therapy, and mother had "not noticed any lies coming from [the child] lately." Mother said that when the child "lies about something, if you ask her enough she'll tell you the truth. You

6.

know, she gives up." Despite mother's repeated questions, the child maintained that Kamer sexually abused her.

{¶ 13} On cross, mother was more direct in her answers about the child's history of lying, saying that the child "did lie a lot." Although mother claimed that she lied to Kamer when she told him that the child asked if she would go to jail if she were lying about her accusations, mother admitted to calling the child a "'fucking little liar[,]'" saying that the child "'needs attention[,]'" and flat-out saying "'I do not believe [the child]. I do not believe her[.]'"

{¶ 14} According to mother, the last time that she and the child saw Kamer was when he was arrested by his parole officer in July 2019. After Kamer's arrest, mother noticed behavioral changes in the child, including reduced bed wetting and the child seeming "perkier, more comfortable." Despite these positive changes, mother recounted two times when the child engaged in inappropriate contact with other children. The first time, while the child's male cousins were visiting, "the children had a doctor's set—and they were checking each other's pee-pee to make sure nobody else was hurt." Mother took the child's doctor set away as a result. The second time, mother thought that she saw the child touching her sibling in the bathtub, so she no longer allowed them to bathe together.

## 2. The jail calls

{¶ 15} During mother's testimony, the state played several recorded phone calls between mother and Kamer for the jury. In the first call, mother mentioned that the child

could not wait for Kamer to get home from jail because she wanted to play their "secret ball game," which the child said she and Kamer played at night while mother was working, but she would not tell mother about because it was a secret. Several times, Kamer responded, "What the fuck?" and said that he did not know what the child was talking about. Later in the call, mother started crying and told Kamer that the child said "some crazy shit today * * *. She said that somebody's fucking raping her." Kamer responded, "I don't even know what to say." Mother explained the circumstances of the child's disclosure of the abuse in detail, and told Kamer that grandfather thought that the child was "fabricating some shit * * *."

{¶ 16} Mother and Kamer both thought that a medical examination would be able to determine if someone had molested the child, and when mother directly asked Kamer if she should take the child to the hospital for an examination, Kamer responded, "Hell yeah." Kamer also said that it "[s]cares the fuck out of [him] * * *" that the child was saying that he was the one who had abused her. He denied that he would ever do anything like that, and mother agreed with him. During the conversation, mother claimed that the child had changed her story three times and had asked if she would go to jail if she was lying. When mother told the child that she would, the child reiterated that the abuse had happened. Throughout the call, Kamer denied abusing the child. He said that the child's accusations meant that "it'd be over with for me * * * not because of me * * *. It's gonna be over with."

8.

{¶ 17} The next day, Kamer called mother before she took the child for her sexual assault examination. During the conversation, Kamer commented, "I agree with the test, but as soon as they talk to her, I'm fucked." He could not explain why the child would accuse him of raping her, but insisted that he would not do anything like that. He did not think that the child was lying about what happened to her, but thought that "she's confused * * *" about "the circumstances * * *." When mother pressed him to explain what he meant, he was hesitant to go into detail, however, because he could not "say shit like that * * *" while he was in the jail. Kamer encouraged mother to get the child examined despite his belief that "as soon as [the child] says anything that puts my name in it, I'm fucked." Mother told Kamer that the child had not changed the story that she was telling mother because the child knew that mother would "flip the fuck out" if she found out that the child was lying. Kamer commented that the child loved getting attention, and was smart enough to know that this situation would get her a lot of attention. During the call, mother and Kamer had the following exchange:

> [Kamer:] I'm never going back [to the motel] anyway. Well, I don't think I'm going anywhere no more, ever.
>
> [Mother:] Why do you say that if—if, like, you really didn't do it? If you really didn't do it, we're going to know, right?
>
> [Kamer:] I didn't, [mother], but here's what you don't realize—
>
> [Mother:] Did you say you did it?

[Kamer:] I didn't. * * * I said I didn't, but here's what you don't realize, man, all it takes is for someone to say that, and it's over with.

[Mother:] It's not, 'cause she's five and she lies and she has a history of lying. And they're gonna know. That's what these doctors—doctors are gonna have to understand when they're talking to her. They're gonna have to get this out of her of what really happened.

[Kamer:] It ain't [the doctors] that I'm worried about.

[Mother:] Then who?

[Kamer:] Who do you think? Police officers. It's over with.

Later, Kamer commented that he had spent all night thinking about how to "end this shit without it hurting, but * * * that's something a guilty person would do." Mother said that she could not discredit the things that the child was saying because of the amount of detail in her disclosures. For example, the child told her step-grandmother that Kamer put his penis in her mouth, after which the child felt something wet in her mouth. Once again, throughout the call, Kamer denied that he molested the child.

{¶ 18} Later that day, Kamer called mother again to find out what had happened after the child's appointment. Mother told him that an investigation was opened and that the child said that Kamer "did it" and was not lying. Mother reported that the exam did not find any physical signs of penetration and that the child did not allege any penetration, but that the child's report was "way too detailed." She also said that the child would have "gave it up * * *" by that point if she were lying. Mother said several

times that she was feeling "conflicted" about the child's allegations and the situation. Again, throughout the call, Kamer denied abusing the child.

{¶ 19} The final call that the state played for the jury was from later that same night. Mother continued to express how conflicted she felt. She told Kamer that he could never be around her and the children again because of the pain that the situation was causing mother and because mother could not get the image of "[Kamer's] dick in [the child's] mouth" out of her head. However, mother later said, "I don't believe [the child]. I do not believe her." Kamer responded, "You have to."

### 3. The child's testimony

{¶ 20} Following mother's testimony, the state called the child to testify.

{¶ 21} The child's brief testimony was largely nonverbal or indecipherable; the majority of her answers are recorded in the transcript as "(Indicating)" and "(Unintelligible)." Most of the time, the prosecutor did not clarify for the record whether the child's "(Indicating)" response was affirmative or negative, tell the child that she needed to give verbal answers, or ask her to repeat or clarify her "(Unintelligible)" answers. The child did, however, respond to some questions with verbal answers.

{¶ 22} After ascertaining that the child, mother, and her sibling lived with Kamer at the motel for a period of time, the prosecutor attempted to engage the child in a discussion about "private parts." The child identified "mouth" and "chest" as two "private parts," but could not or would not say the names of the others. To assist the child, the prosecutor showed her the drawings she made during her forensic interview.

11.

The drawings consisted of several pictures of a girl that each had different crayon markings on them. As the prosecutor clarified for the record, the child "pointed to the butt * * *" of one drawing and "the vaginal area * * *" of another drawing.

{¶ 23} Regarding incidents of sexual abuse, the child provided nonverbal or unintelligible answers to nearly all of the state's questions. However, the state was able to elicit verbal responses from the child that (1) "Gregory" had touched the child's (unspecified) private parts; (2) the touching had happened "[a]t the hotel" where they were living; (3) it happened while the child was lying down and "[o]n mommy's bed"; (4) it happened while mother was "[a]t work" and the sibling was sleeping in her own bed; (5) the child wore a nightgown; (6) the child would watch videos of children playing with LOL Dolls on Kamer's phone while the touching happened; and (7) the child could not remember what type of phone Kamer had.

{¶ 24} There were several times when the prosecutor asked the child about a "secret" between her and Kamer. The child gave either nonverbal or unintelligible answers to each question, despite the prosecutor's admonition to the child to "remember what we talked about, about giving the right answers and telling the truth—about telling the truth? * * * I just want to make sure that you're telling the truth." After the fifth time that the prosecutor asked the child about a "secret" and did not get a response, the state asked to refresh the child's memory of the events that happened at the motel with a video

12.

of the child's forensic interview.[1]  Although the trial court agreed—over Kamer's objection—and intended to allow the state to play the interview in front of the jury, due to technical difficulties with the court's audio-visual system and a notification that a court employee had been exposed to COVID-19, the court sent the jury home for the day before the state played the interview for the child.

{¶ 25} When court resumed the next morning, the state chose not to play the video of the forensic interview, and ended its examination of the child without asking her any more questions.

{¶ 26} Kamer did not cross-examine the child.

### 4.  The investigating witnesses

{¶ 27} The state also presented the testimony of three witnesses who investigated the child's allegations of abuse.

{¶ 28} First was Simon, a detective with the LTPD.  He first learned of the child's accusations against Kamer from Grieser.  After meeting with Grieser about the case, Simon and Grieser went to the motel to speak with the child and mother to get some initial information.

{¶ 29} Simon said that he observed, but did not participate in, Grieser's forensic interview of the child.  He thought that the child seemed very intelligent, was very detailed in her answers, was in a positive mood, and appeared comfortable with Grieser.

---

[1] The state neither offered the video into evidence nor proffered it for the record, so the recording of the forensic interview is not in the record on appeal.

13.

{¶ 30} When the prosecutor asked Simon what he learned from the interview that he "continued to investigate[,]" the trial court overruled Kamer's hearsay objection on the basis that the information was "being offered as a matter of establishing what happened in the investigation." Simon responded that he

> learned of multiple disclosers [sic] of penetration to [the child] by Mr. Kamer, who she named. Two instances in particular when mom * * * when she went into work nights * * *. [The child] was very descriptive as far as—one instance they were in a bathroom and she used her hands on Mr. Kamer. And when he finished, she asked, ''What was that?" He stated that it was pee. And when we asked—or, when Ms. Grieser asked, "What did it look like?" She said, "It was white and it looked like slime."

> Another instance she had disclosed that sometimes she touched him with her mouth. Other times he inserted his penis into her vagina and into her butt.

{¶ 31} Simon also relayed that "some times before acts were committed * * * Mr. Kamer would give [the child] his cell phone and say, 'Just relax and watch TV.' And she * * * made statements that she watched people having sex on his phone." This led Simon to get a warrant to search Kamer's cellphone, but "there was nothing that [he] found of any value—any evidentiary evidence value—to the case." On cross, Simon said that he obtained Kamer's phone from someone at the Lucas County Adult Parole Authority, who

had taken the phone at the time of Kamer's arrest in July, approximately two or three weeks before the child disclosed the abuse.

{¶ 32} In speaking to mother a second time, based on the child's statement in the forensic interview that Kamer molested her at night while mother worked, Simon was able to determine that there were two nights—July 11 and July 19—when mother worked an overnight shift at the motel and Kamer watched the children.

{¶ 33} As part of his investigation, Simon also obtained recordings of the phone calls that Kamer made to mother while he was in jail and the report produced by the SANE following her sexual abuse examination of the child. Regarding the SANE's report, Simon said that "[t]he discloser [sic] made in the SANE report and the discloser [sic] made after observing the [forensic] interview at Children Services, are very similar."

{¶ 34} According to Simon, the child did not name anyone else as the perpetrator; during her interview, the child "stated Mr. Kamer. She stated dad." When Simon interviewed Kamer, Kamer did not provide any alternate suspects for Simon to investigate. He said that the only men the child was around regularly were him and her grandfather, and Kamer did not accuse grandfather of molesting the child. Consequently, Simon did not interview or pursue any other suspects in this case.

{¶ 35} The final aspect of the investigation that Simon testified to was observing an interview of G.K., Kamer's former stepdaughter, that was conducted by Toledo Police Department detectives. During the interview, G.K. "essentially made a discloser [sic] to detectives that similar instances of sexual assault occurred by Mr. Kamer against her

15.

when she was younger." On cross, Simon admitted that he had "learned of" a Facebook post by G.K. that supported Kamer and indicated that he would never sexually assault a child, but that he had not seen the post.

{¶ 36} The state's next witness was Grieser, a child abuse investigator for JFS. She became aware of the child's allegations against Kamer through a report by a medical provider. The day after JFS received the referral, Grieser and Simon went to the motel to speak to mother. Grieser told mother about the allegations, explained the investigation process, and scheduled a forensic interview of the child for the next day. Grieser did not have any safety concerns for the child when she visited the motel because Kamer was no longer residing there.

{¶ 37} When the prosecutor asked Grieser about the forensic interview process, Grieser said that the interview is conducted in a "recorded room" with just Grieser and the child present. She said that the "primary reason" for a forensic interview is to "get to the truth. To gather facts." She elaborated on cross that she does not ask leading questions in a forensic interview, but will ask questions to clarify something the child says.

{¶ 38} As Grieser began testifying to the specifics of her interview with the child, defense counsel made a continuing objection to Grieser's testimony about what the child said at the interview on the basis of hearsay. The trial court overruled Kamer's objection because the child "was here, was subject to cross-examination, so it is not hearsay."

16.

{¶ 39} Grieser testified that, during her interview of the child, she used "anatomical drawing[s]" to allow the child "to go into a little bit more detail" and to ensure that she and the child were "talking about the same body parts." The child marked on a total of four drawings. Regarding the first one, which showed the front of a little girl, according to Grieser, the child told her that "she refers to Greg as daddy. She told me that daddy put his vagina inside her vagina.[2] And when I asked her, you know, to identify where, that is what she drew the penis coming out of vagina. * * * She had also disclosed that he had inserted his finger inside of her vagina." Regarding the second drawing, which showed the back of a little girl, Grieser said that she asked the child "if anybody touched her on her backside and she said that he put his penis inside of her butt." And Grieser said that the drawing on the fourth page was what the child did in response to Grieser asking "what daddy's penis looked like * * *."

{¶ 40} Grieser's overall impression of the child's interview was that the "interview was extremely detailed. [The child] was extremely knowledgeable about sexual acts. She was extremely—if I would ask her something and I was not correct, she would correct me during the interview. She was extremely—she was able to provide a lot of detail and we typically don't see that in kids her age."

{¶ 41} On cross-examination, in response to defense counsel asking if Grieser "specifically ask[ed the child] if Mr. Kamer had touched her vagina[,]" after responding that she did not "typically" ask leading questions in forensic interviews, Grieser said that

---

[2] The child called both female and male genitalia "vagina."

"[t]he interview started with [the child] telling me, 'It is true, though.' And I asked her, 'What is true?' And that is when she said, 'Daddy touched me.'" When questioned about specifically asking the child if someone had touched her backside, Grieser classified that as a "clarifying question." Although Grieser recalled showing the child the anatomical drawings and generally asking "'Has anybody touched you there,'" she could not recall whether she specifically asked the child if Kamer had touched her vagina.

{¶ 42} The final investigating witness was Martinez, who examined the child at the hospital. She testified that she is a registered nurse who has completed SANE training and is able to do SANE exams, but has not taken the examination to become a certified SANE. Martinez met the child when mother and grandfather brought her to the hospital in August 2019. Before examining the child, Martinez spoke to mother to get information about what brought the child to the hospital and about the child's medical history. Martinez said that she "write[s] everything down" when speaking to the patient and their guardian. The prosecutor asked Martinez to read the portion of the child's medical records that included mother's explanation for bringing the child to the hospital. Martinez testified that mother said

> Last night [the child] was at a family event with [grandfather]. She
> was playing Barbie's [sic] with another girl. [The child] took all the
> Barbie's [sic] clothes off and put one on top of the other. The girl asked
> [the child], "What are you doing?" [The child] said, "They're just having
> sex. Mom and Dad have sex sometimes and me and Dad have sex." The

little girl told her mom and she told her step mom. That's how I found out. She lies so much. She gets in trouble at school. When I asked her what she said, she said, "I didn't say anything. Will I get in trouble [for] lying?" I told her "Yes you will." Then she said it did happen. I don't know what to believe so I told her she was going to have to come to the hospital and tell the truth. On the way here she said she didn't want to come anymore and that she was lying but she didn't want to get in trouble. I also asked her if he hurt her and she said no. I asked her what it felt like and she said, "I don't know mom, we just had sex." I'm really confused. I don't know what to believe. * * * I'm worried about [the child] because she gets in trouble at school. She gets very angry if another kid is getting attention. I feel like she is starving for attention. She is very hyperactive and sneaky. When she was staying with my dad, they had to put bells on her door because she would try to sneak out. I have a school psych appointment, it's through her pediatrician * * *. I want to get her counseling or whatever she needs.

Martinez also asked mother what the child called certain body parts, and recorded that the child called female genitalia "girl fragile or vagina," male genitalia "boy fragile or vagina," and the anus "butt." Martinez said that she did not have any major concerns about the child's medical history that mother provided.

{¶ 43} After speaking with mother, Martinez spoke with the child to "get from [her] standpoint why [she was] here." The prosecutor asked Martinez to read her conversation with the child:

Nurse to patient:  Do you know why you are here today?

Patient to nurse:  Yes.

Nurse to patient:  Why?

Patient to nurse:  Because a reason.

Nurse to patient:  Oh, what's the reason?

Patient to nurse:  I really forgot.  This time I really forgot.

Nurse to patient:  Okay, well what about the Barbie's [sic]?

Patient to nurse:  They are doing sex.

Nurse to patient:  What is sex?

Patient to nurse:  It's when girls and boys pull down their pants and get on top of each other.

Nurse to patient:  What happened with you and your dad?

Patient to nurse:  We had sex.

Nurse to patient:  What kind?

Patient to nurse:  The kind where the boy sticks his vagina in the girls [sic].  He thought I was allowed to do it when my mom is gone because he thought I was going to get in trouble.

Nurse to patient:  Did your dad put anything inside you?

Yes.

Nurse to patient:  What did he put inside?

Patient to nurse:  He put lotion and germs in my vagina, like he usually does.

Nurse to patient:  Did he do anything else?

Patient to nurse:  He just put his fragile inside of mine.  That was it.

Nurse to patient:  Where did he do this?

Patient to nurse:  On my mom's bed, and we were in the bathroom. He said he was teaching me.

Nurse to patient:  Teaching you what?

Patient to nurse:  Sex.

Nurse to patient:  What happened in the bathroom?

Patient to nurse:  We used to do it.

Nurse to patient:  Do what?

Patient to nurse:  I would rub his vagina to make it come out.  When I said "What is that?"  He said, "It's pee."  I said, "It looks like slime."

Nurse to patient:  What color was it?

Patient to nurse:  It was white.

Nurse to patient:  Did anything hurt you when you had sex?

Patient to nurse:  Yes, so I told him, "Easy, not that hard," but we did it the other night.  I told him the same thing so he stopped.

Nurse to patient:  Does anything hurt you right now?

Patient to nurse:  No.

{¶ 44} Martinez testified that "[i]t wasn't surprising at all" that the child was not reporting any current pain for several reasons.  First, she explained that lack of pain could be related to the amount of time that had passed since the abuse because the "area heals generally pretty quickly, so, any amount of time would assist with any healing."  She also opined that it was possible that there was "just partial penetration, so that nothing was damaged.  Nothing was injured.  And there also could have been some type of lubrication to ease some of that so that there wouldn't be any injury."  She also explained that, because the area heals quickly, she might not "catch" an older injury simply because of the passage of time.

{¶ 45} Martinez said that the next step in a sexual assault examination is the physical examination.  She explained that she does a "literal head to toe" exam to check for injuries.  She did not find any injuries on the child.  She said that she did not collect any "samples" during the child's exam because it was more than 72 hours after the last incident of abuse.  Martinez said that state protocol precludes the collection of samples after 72 hours because "the patient doesn't hold any kind of DNA evidence after that."

{¶ 46} When Martinez finished testifying about the child's sexual assault examination, the prosecutor asked a line of questions about hymens.  Martinez first said that it is "not generally" possible to tell if a female has had sex based on the condition of her hymen.  She went on to explain that "there was a general conception that [the hymen]

22.

could cover completely the vagina, but that is not true." She said that hymens vary in appearance and can have more than one opening, so the fact that there is an opening in the hymen "cannot be used to tell if somebody has had sex * * *." Martinez said that she could "[n]ot at all" make a determination about whether the child had had sex.

{¶ 47} Finally, Martinez testified that the urinary pain the child had complained of in the past could be the result of sexual abuse "if there was an infection. Bacteria is very easily introduced just because the urethra opening where the urine comes out is very close to the vagina area * * *." She also said that "any type of touching in that area * * *" might "cause some irritation."

{¶ 48} Defense counsel did not object to any of Martinez's testimony.

{¶ 49} On cross, Martinez confirmed that she did not find any evidence of sexual assault beyond the child's statements. She did not see any evidence of acute injuries anywhere in the child's genital area or see anything that would suggest past injury to the area. Additionally, based on mother's statement that Martinez recorded in the child's medical records, Martinez said that "[i]t seemed that * * *" the child had admitted to mother that she was lying about the sexual assaults. Martinez confirmed that the child did not complain about any discomfort that would have suggested that the child had a urinary tract infection at the time of the exam, and mother did not tell Martinez that the child had a history of urinary tract infections. Martinez said that the bacteria that cause urinary tract infections could be introduced to the area by other things, like improper wiping.

23.

## 5. The state's remaining witnesses

{¶ 50} The state had two additional witnesses against Kamer: Alstott and G.K.

{¶ 51} Alstott is a licensed clinical social worker and forensic interviewer who the trial court qualified as "an expert as a forensic interviewer and in the field of early childhood alleged sexual abuse."

{¶ 52} Alstott began her testimony by providing background about children who are victims of sexual abuse and adults who perpetrate sexual abuse. First, Alstott talked about two ways that children disclose sexual abuse. One is an "accidental disclosure," which she described as a disclosure that "kind of blurts out." These disclosures are often made without much forethought about the consequences of disclosing, such as other people finding out or someone getting in trouble. The other is a purposeful disclosure, which happens when "a child has made the decision that the risk to keep the secret is far greater than the risk of telling. Meaning that really they just can't take the abuse anymore and they need somebody to know." She said that both types of disclosures are "often delayed." Generally, "the younger a child is and the longer the access and the duration of the abuse was with somebody who is inside of the family happens, the longer it takes for them to tell somebody."

{¶ 53} Alstott explained that, in younger children, part of the delay can be attributed to processing what happened because they do not have a frame of reference for understanding what sexual abuse means. Abusers often play into this by telling the child that the abuse is "a game or a secret," which makes it difficult for young children to

24.

understand that they are supposed to tell someone about the abuse. She also said that young children tend to disclose abuse once the abuser is no longer around them or they see a presentation at school about "body safety" and realize that something inappropriate has been happening to them.

{¶ 54} Alstott also testified that children tend to disclose in pieces; they "will often give a little bit and sort of gauge the reactions of the people that they're telling." Only disclosing part of the abuse can be a response to the emotions and reactions of the adults the child tells, which "can be very difficult for a child to sort of juggle." Alstott also said that partial disclosures are a function of "the way the memory works." A child might later remember something that did not occur to her at the time of the initial disclosure, or someone might ask a question that prompts her to remember something else. Alstott explained that "to hear more things coming out or additional statements, doesn't mean that the initial [forensic] interview was wrong or that the child made anything up. It is more that they gave you maybe what they were asked for, or they hadn't thought, or something hadn't occurred to them."

{¶ 55} Alstott went on to say that young children often struggle to talk about sexual abuse for several reasons. First, developmentally, the abuse is not something that a child understands or has the words to describe. Second, because abusers are generally close to a child's family and someone that a child loves, a child often has to contend with mixed emotions about the abuser, which "can be very confusing and complicated and kind of make it very difficult for kids to talk about." When abuse occurs within the

25.

family, Alstott said that the abuser's relationship to the rest of the family also plays into a child's difficulties in disclosing abuse. Finally, there is the dynamic between children and adults in which adults have power and are believed.

{¶ 56} Alstott also testified about behaviors in young children who are sexually abused. She said that "[o]ften young children who are abused are diagnosed with things like ADHD or behavior problems—behavioral disorders—or learning disabilities * * *," which she said could be a manifestation of the trauma the child had experienced. As far as behaviors these children display, Alstott described a range of behaviors, including clinginess, increased need for affection and attention from non-caregivers, disrupted sleep, lower academic performance, isolating from peers, acting withdrawn, and "regression in things like bed wetting."

{¶ 57} Regarding typical adults who sexually abuse children, Alstott said that they will generally gain the trust not just of a child, but of that child's family and community. They often seek out children from broken homes that are lacking in resources. They also tend to seek out children who have behavioral issues or disabilities because those children might be less likely to be believed if they disclose abuse. However, Alstott also said that, of the things she described, "some of it or none of it, honestly[,]" could be present in any given case.

{¶ 58} Alstott further testified that it is not typical to find physical injuries to the genitalia of child sexual abuse victims because adult offenders are "very careful" in how they perpetrate the abuse. For example, she said that the adult might use lubricant or go

26.

very slowly to avoid hurting the child because "[i]f a child is injured or it doesn't feel good to them or it hurts their bodies, they may tell somebody right away and [the adult] would lose their access to be able to continue the abuse." Because physical findings of abuse are rare, Alstott said that studies she referenced in her testimony "say very clearly" that clinical diagnosis of sexual abuse "should really lean on how the child describes their abuse. How they account for what happened and the way that they talk about it and the way that's documented * * *."

{¶ 59} When Alstott conducts a forensic interview, she said that she looks at whether the child is answering her questions and is able to provide "extra details" about the abuse to determine whether the child is giving her accurate information. She said that contextual details, such as how something looked or felt on their body, help her determine whether a child's sexual knowledge comes from, for example, being exposed to pornography or from experiencing sexual abuse. She also explained that, because of the way memory works, it is difficult for children, especially younger ones, to give specific dates or a specific number of times that abuse happened.

{¶ 60} Specific to Kamer's case, Alstott said that she saw some similarities to the typical cases that she had described. Mother and the child's relationship was "reforming" because they had been separated while mother was incarcerated. Kamer moved in with mother quickly and babysat the child, which gave him access to the child and helped him build relationships with the family. Alstott said the child's grandparents thought of Kamer as "a great guy" and that "[n]o one could understand how he could do this."

27.

Alstott thought that the child wanted to protect Kamer because she thought of him as "her brand new dad" and she would be sad if she did not get to see him anymore.

{¶ 61} When the child first disclosed the abuse, she blurted out the information while playing with dolls and without any forethought about the consequences of the disclosure. Alstott noted that the child added details that Grieser did not ask for to some of her answers during the forensic interview. She also noted that the child was diagnosed with ADHD and described as "very smart and needing a lot of attention * * *[,]" and that the child had some difficulty sleeping after disclosing the abuse.

{¶ 62} When the prosecutor asked Alstott if, in her "professional opinion," the child "display[ed] behaviors and characteristics of a sexually abused child[,]" Alstott responded,

I never met [the child], so, you know, it's all based on the things that I've read and the information given to me. But, I think the clinging, the way that she has consistently reported that this has happened, the details that she gave about her maltreatment—that many of them were not directly asked of her. She just sort of gave additional information. And certainly, you know, the characteristics around the family dynamic and everything happening there, that I think that she was very consistent in her discloser [sic].

{¶ 63} On cross-examination, when defense counsel asked Alstott if it was "fair to say, that the factors in this case involving [the child] differ pretty substantially from many

other cases that [Alstott had] been involved in[,]" Alstott responded that "[a]ll of our cases are sort of individual in nuance. There's a lot of different family dynamics." However, Alstott saw "quite a few" similarities between this case and other sex abuse cases, which she listed as "the [child's] trauma of being separated from her mother; the attention-seeking behavior; the access that [Kamer] had." Although most of the trauma the child experienced happened before she met Kamer, "it certainly imprinted on her development and the way that she experiences the world." Additionally, Alstott recalled that the child had issues in school, but she did not know whether the issues started before the child met Kamer; the child was described as exhibiting jealous behavior and wanting a lot of attention from people, which started before the child met Kamer; and Alstott did not know why the child was being clingy.

{¶ 64} Alstott admitted that young children can make errors in their source monitoring—which she described as "how we know what we know"—and that the information the child provided to investigators could have come from events that happened before she met Kamer. She acknowledged that the child said that she had seen mother and Kamer having sex, and that some of the child's observations could have been connected to seeing that. She also acknowledged that the child could have heard the adults using the phrases "[w]hoa, whoa, whoa, take it easy" and "[j]ust relax and watch TV" in connection with sexual activity. And, although Alstott pointed to the child's drawing of Kamer's penis with lines on it as one of the specific details that the child gave in her interview, she admitted that the child could have learned what Kamer's penis

29.

looked like in a context not related to sexual abuse, such as Kamer walking out of the bathroom naked at a time when the child was supposed to be asleep. However, Alstott did not know what the child had been exposed to, particularly before she met Kamer; Alstott only knew the information that was in the reports provided to her by the state.

{¶ 65} Finally, over Kamer's objection, the state called G.K., Kamer's former stepdaughter, to testify. She said that she considered Kamer her dad because he was the only father figure that she had ever had. G.K. said that she, her mother, and her siblings lived with Kamer from the time she was two or three years old until she was nine or ten years old. During that time, G.K.'s mother worked nights, and Kamer watched the children while she was working.

{¶ 66} G.K. testified about two times that Kamer sexually assaulted her. One incident happened when she was nine years old. She said that Kamer took her into the bathroom, turned off the light, removed her pants and underwear, sat her on the sink, and inserted his penis into her vagina. The assault lasted approximately five minutes, and Kamer did not say anything to G.K. while it happened. When he finished, he took her off of the sink, told her to put her pants and underwear back on, and wiped something off of the sink with toilet paper. The assault happened while G.K.'s mother was home. G.K. said that she was "scared," "in shock," and "didn't know what to do." She did not tell her mother about the rape because she was "scared of the things that Gregory would have done if he heard that I had told my mom."

30.

{¶ 67} Regarding the second assault, G.K. did not give a specific timeframe when it happened or age that she was at the time. This time, G.K. said that she was sleeping in her bedroom when Kamer inserted one of his fingers into her vagina. G.K. did not tell her mother about this rape, either, because she was "scared."

{¶ 68} G.K. testified that she kept the assaults to herself even though children services workers would come to her house throughout her childhood and ask if there was any type of abuse in the home because she was "scared" and "felt like [she] couldn't tell anybody." She finally disclosed the abuse after Kamer was indicted in this case.

{¶ 69} Her disclosure came in response to a news article about Kamer that was posted on Facebook. Initially, G.K. "got on there defending him saying that he would never do that, that he was [her] father." However, "after a short period of time," G.K. deleted her comment. She then disclosed the rapes to her mother. When the prosecutor asked G.K. why she defended Kamer, she responded, "Because he was my dad. And—I don't know."

{¶ 70} On cross-examination, G.K. candidly admitted that her comment on Facebook that Kamer "would never do that * * *" was a lie. She also admitted that Kamer was not living with her for approximately three years because he was incarcerated, but that she did not disclose the abuse during that time or do anything to prevent Kamer from moving back into the home when he was released. It also came out on cross that children services workers were at G.K.'s home "about every month," but despite her frequent contact with children services and the workers' inquiries about her

31.

safety, G.K. did not report that Kamer had hurt her. Nor did she ever tell a teacher, guidance counselor, or her therapist. Other than her mother, G.K. told one friend, but it took her nine years to make the disclosure.

{¶ 71} G.K. clarified on redirect that she never told children services about the rapes because she "felt ashamed[,]" "at the time [she] felt like it was [her] fault[,]" she "didn't want to[,]" and she "felt like nobody was going to believe [her] because it was so long since it happened."

{¶ 72} After G.K. testified, the state rested.

**B. Kamer's case**

{¶ 73} After the state rested and the trial court denied his Crim.R. 29 motion, Kamer testified in his own behalf.

{¶ 74} Kamer testified that he met mother at a halfway house and that their relationship "was pretty much just sexual" at first. They continued their relationship after they both left the halfway house, and mother eventually became pregnant with the sibling. Mother was in prison when she had the sibling, but after she was released, she and Kamer resumed their relationship.

{¶ 75} When mother got a job at the motel, she, Kamer, and the children moved into one of the rooms there. During this time, Kamer said that he was alone with the children for "small amounts" of time, but never for very long because he would not change diapers, so he could not watch babies. He explained that his mother had been sexually abused as a child and she "drilled" him with that. Kamer said "it got to the point

32.

where it scared me for being around kids. It terrified me. So, it, like, shook me. I can't change diapers to this day."

{¶ 76} As Kamer described it, the first room that the family lived in had one bed in the middle with approximately four feet of space on either side of the bed. The child's toddler bed was on one side of the bed, and the sibling's crib was at the foot of the bed. Kamer said that there was "no privacy" in the room. Despite that, Kamer and mother had sex "at least five times a week." They stayed under the covers and made a wall of pillows to try to keep their activities private, but Kamer said that they could hear everything happening in the child's bed and she could hear what was happening in their bed. While the family's second room at the motel was bigger, Kamer said that it was still "just one big open square." Although mother purchased a partition to put between the beds and give them some more privacy, Kamer said that the child put a hole in it. Kamer first noticed the hole when he saw the child watching the adults' bed through the opening. Kamer covered the hole with a sticker.

{¶ 77} Kamer recalled three times that the child saw something of a sexual nature while they lived in the motel. First, he recounted a time when he and mother were having sex while living in the first motel room. He said that the child woke up and asked "'Mommy, why are you crying?'" Kamer thought that the child heard mother moaning and mistook it for crying. Next, he said that one time while he and mother were having sex, he saw the child "just standing at the end of the bed just, like, stunned, like, looking at us." Finally, one time, around 3:00 a.m., Kamer walked to the bathroom naked. He

33.

did not think that the child would be awake, so he was not worried about being nude. However, when he came out of the bathroom, the child was standing outside the door, and Kamer said that he "walked right into her almost * * *." He immediately went back into the bathroom and closed the door. After each of these events, mother yelled at the child and put her back to bed. Kamer also testified that, after they moved into the second room and had the partition up, he and mother would sometimes have sex while the children were awake, but on the other side of the partition. Kamer admitted that he and mother had used phrases like "'[e]asy[,] easy, easy, not so hard" and "[j]ust relax. Watch TV" while they were engaging in sexual activity.

{¶ 78} At some point during the investigation, the child made a comment about Kamer having a gun. He testified that he never had a gun at the motel. However, he had been shooting at a gun range about one month before his arrest. He believed that the child's comment came from hearing him talk about the gun range. He also said that he never had any pornography on his cellphone, which was confiscated when he was arrested—well before the child made her allegations. Additionally, Kamer testified to a time before he and mother moved in together that he caught the child and another little girl kissing.

{¶ 79} When asked about his reluctance to talk about the child's allegations against him during the recorded phone calls, Kamer explained that he had been in jail "most of [his] life" and there are "certain things you don't talk to the other inmates about. And being accused of sexual assault in a jail, that's not really what you want to be

accused of. They will kill you. You could just literally die in there." Regarding his comments that he would be in trouble as soon as the child made allegations of sexual abuse against him, Kamer said that he had been in prison with many men who told him that if he went "'in front of them with a sex case, no matter what, they're going to find you guilty.' * * * So, I am terrified of this."

{¶ 80} Regarding G.K., Kamer said that that he never sexually assaulted her and thought that he was in prison at the times that she alleged that the assaults happened.

{¶ 81} On cross-examination, Kamer said that he was unaware of any problems that the child had with him before he was arrested in July 2019. He said, however, that "[f]rom the beginning, [the child] made multiple accusations and showed sexual things before [he] even moved in with them." He claimed that he told mother about these issues, but she did not do anything about them.

{¶ 82} When the prosecutor asked Kamer about the phone calls, Kamer explained that he told mother that she "ha[d] to" believe the child because "[f]rom a parent stand— what parent wouldn't believe their kid?" He never said that he believed the child, however. Eventually, Kamer agreed with the prosecutor that the child was "the one that's lying[.]" He clarified that the child was not lying about seeing him and mother have sex, but was "[a]bsolutely lying" when she said that she and Kamer had sex and lying about touching Kamer's penis until "white stuff comes out[.]" The prosecutor asked, specifically, if the child was lying to mother, Grieser, and Martinez about having sex with

35.

Kamer.  He said that she was and claimed that the child also told each of those people that Kamer had not molested her.

{¶ 83} Regarding G.K., Kamer reiterated that he did not assault her.  He said that G.K. was either lying about him or confused about who actually assaulted her, but he was "very sure it wasn't * * *" him.

{¶ 84} Finally, Kamer agreed that, during his interview with the police, they asked him for other possible suspects, but he did not know of any because "'[t]he only people that she's around are me and grandpa, and I'm not blaming grandpa[.]'"

{¶ 85} Kamer's other witness was Forgac, a psychologist who has a private practice and does evaluations for courts throughout northwest Ohio.  He began his testimony by explaining that children who are four, five, or six years old "have a different way of viewing things."  He said that a child in that age range views the world differently because "they make errors in their thinking."  At five years old, children "are just responding to situations and they're not fully in control of themselves.  * * * They misperceive things.  They misunderstand things."  Forgac went on to explain that children tend to make "source monitoring errors," which means that

> they will know that something happened and claim that they know that something happened, but they can't remember the source.  * * *
>
> Their awareness of events—whether they've dreamt the event, whether they saw the event, whether they heard the event, whether they were told about the event, or they watched it on television—they're usually

not able to identify where that came from, but they know that it happened. And sometimes they'll make the mistake of claiming an experience that they had when it wasn't an experience they had, it was an experience that they saw. And so this is one of the reasons that children are oftentimes at this age accused of lying. And they're really not lying. They just don't know.

{¶ 86} Forgac also said that a child's environment can impact their perceptions and behaviors. He saw several factors in the child's environment that could have affected the child's perceptions as they related to this case. First was the fact that the child was living in a motel room with little privacy where she could see and hear things of a sexual nature that were going on around her. Next was the general instability of the child's home life. Her biological father left when she was four years old. Around the same time, mother was sent to prison, so the child was living with grandfather and step-grandmother. When mother came back from prison and the child reunited with her, mother also had a new baby. Forgac said that making adjustments to a changing environment can divert attention from normal developmental issues that a child might have. Finally, Forgac noted that the child had been diagnosed with ADHD, which caused some problems in school.

{¶ 87} Forgac also noted his concerns with the SANE report. "What stood out to [him] was that there were absolutely no physical findings * * *." While he acknowledged that physical findings are not a requirement for determining that someone

was sexually abused, he said that, based on trainings he had attended that focused on false allegations of sexual abuse, vaginal and anal penetration of a young child "oftentimes" results in physical findings, including damage to the hymen.

{¶ 88} Considering the child's environment and the case information that he reviewed, Forgac said that is was "possible" that the child could believe that something that had happened between other people had actually happened to her, which affects the trustworthiness of her report of sexual abuse.

{¶ 89} On cross-examination, Forgac admitted that his work and research did not focus on child abuse. However, he has been qualified as a child abuse expert before, and had testified that a child was sexually assaulted. Forgac recognized that the American Board of Pediatrics publishes articles indicating that most sexually abused children do not present with physical findings, agreed that genital and anal tissue heals quickly and completely from most trauma, although he said that it takes some time, and was aware that a normal exam of the genitals and anus can neither confirm nor deny sexual abuse.

{¶ 90} Finally, regarding a five- or six-year-old child, Forgac agreed that consistency and detail in their statement would be an indication that the child was telling the truth.

{¶ 91} Following Forgac's testimony, Kamer renewed his Crim.R. 29 motion, which the court denied. He then rested.

38.

**C. Outcome**

{¶ 92} The jury found Kamer guilty of rape in counts 7 through 10 and gross sexual imposition in count 11; it found him not guilty of the remaining counts in the indictment.

{¶ 93} At sentencing, the trial court imposed terms of life in prison without the possibility of parole for each of the four rape convictions and 30 months in prison for the gross sexual imposition conviction. The court ordered Kamer to serve all five sentences consecutively.

{¶ 94} Kamer now appeals his convictions, raising seven assignments of error:

I. The trial court erred when it admitted hearsay evidence over objection despite that evidence not falling into any hearsay exception, in violation of the right to confrontation of witnesses under the Ohio and United States Constitutions[.]

II. The trial court erred when it admitted evidence pursuant to Evid. Rule 404(B) over objection for the purposes of establishing identity when identity was not an issue in the case, contrary to State v. Hartman, and the court's limiting instructions to the jury were insufficient to cure the prejudicial effect of the improperly admitted testimony[.]

III. The trial court erred and denied the defendant his right to present a defense and cross-examine witnesses under the Ohio and United States Constitutions when it refused to admit evidence which would have been

used both to impeach the credibility of the complaining witness, but also to demonstrate and clarify the issue of "source monitoring errors" for the jury, requiring reversal[.]

IV. The indictment in this case was fatally flawed in that it charged multiple carbon copy counts such that the defendant was not afforded proper notice of the charges against [sic] as required by the Ohio and United States Constitutions, and since no intelligible distinction exists between the acquitted charges and the convicted charges, and the required Bill of Particulars was not filed, no conviction in this case is supported by sufficient evidence[.]

V. The trial court committed plain error when it improperly permitted expert testimony from the SANE Nurse, the Police Detective, and Child Services interviewer despite none of these witnesses being qualified as an expert and counsel was ineffective for failing to object to inadmissible hearsay[.]

VI. The cumulative errors and plain errors of the trial court combined to deprive the defendant of a fair trial[.]

VII. The convictions are against the manifest weight of the evidence[.]

## II.     Law and Analysis

### A.  Kamer's evidentiary assignments of error

{¶ 95} Kamer's first, second, third, and fifth assignments of error each address the trial court's evidentiary rulings during the trial.  For ease of discussion, we address them out of order.

### 1.  The trial court properly excluded Kamer's proffered impeachment evidence.

{¶ 96} In his third assignment of error, Kamer argues that the trial court erred by preventing him from introducing two videos that, taken together, appear to show the child making a false allegation of sexual abuse against another person.  He contends that the videos would have been useful to impeach the child's credibility on cross-examination and could have been used in cross-examining the state's experts and investigators regarding the issue of source-monitoring errors.  He argues that this goes beyond an error in the trial court's exercise of discretion to admit or exclude evidence and rises to the level of violating his constitutional right to confront the witnesses against him.

{¶ 97} The state responds that the trial court excluded the videos of the victim based on their lack of relevance to the trial, and did not abuse its discretion in doing so.

{¶ 98} "[T]he admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice."  *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001).  Abuse of discretion means that the trial court's decision was

unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).

{¶ 99} The first video that Kamer attempted to admit was a home video of the child saying that a "son" had touched her vagina when she was living at the motel. As the child is making this allegation, someone who is only partially visible on one side of the frame appears to whisper something to the child, and, shortly after, someone who is only partially visible on the other side of the frame tells the child "that's enough," and ends the recording.

{¶ 100} This video led to Grieser conducting a second forensic interview of the child. During the interview, the child tells Grieser that she did not know that the video was being made or that it was a "set up." The child explained that her "stepsister," who was 12 or 13 years old, told her to "tell on" a boy who is the child's friend because the stepsister "wanted Gregory to get out of jail." The child said that she did not remember what she said in the video about the boy.

{¶ 101} Under these circumstances, we cannot say that the trial court abused its discretion by excluding the videos. When a victim has made a prior false accusation of sexual assault, the trial court has discretion under Evid.R. 608(B) to allow the defendant to cross-examine the victim about the allegations, but "under no circumstances would the defense be permitted to introduce extrinsic evidence" regarding the false accusations. *State v. Boggs*, 63 Ohio St.3d 418, 422, 588 N.E.2d 813 (1992). Kamer contends that, despite the constraints of Evid.R. 608(B) and *Boggs*, he should have been allowed to use

42.

the videos to cross-examine the state's expert and the investigators. However, the defendant may only cross-examine the *victim* regarding prior false accusations of sexual assault, and, regardless, no extrinsic evidence of the accusations is allowed. *State v. Minton*, 2016-Ohio-5427, 69 N.E.3d 1108, ¶ 37 (4th Dist.); *State v. Netherland*, 132 Ohio App.3d 252, 263, 724 N.E.2d 1182 (1st Dist.1999).

{¶ 102} Here, Kamer sought to cross-examine witnesses other than the victim using extrinsic evidence. We see no error in the trial court's denial of that request. Kamer's third assignment of error is not well-taken.

## 2. Although Simon and Grieser did not provide expert testimony, the trial court committed error—but not plain error—by permitting Martinez to provide expert testimony.

{¶ 103} In his fifth assignment of error, Kamer raises two separate issues. First, he claims that the trial court committed plain error by allowing Simon, Grieser, and Martinez to testify as experts without being qualified as experts or providing expert reports, as required by Crim.R. 16(K). Second, he argues that trial counsel's failure to object to the hearsay in Martinez's testimony rose to the level of ineffective assistance of counsel.

{¶ 104} The state responds that Martinez properly provided lay opinion testimony, and, because she was not presented or qualified as an expert witness, Kamer's Crim.R. 16(K) arguments fail. The state also contends that trial counsel's decision to not object to Martinez's status as a lay witness was trial strategy, not ineffective assistance of counsel.

43.

**{¶ 105}** Under Evid.R. 701, a lay witness is permitted to testify to his or her opinions or inferences if they are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." When assessing lay opinion testimony, "the critical point is whether the opinion of the lay witness will truly be helpful to the jury; i.e., if the basic facts are clear and the jury is able to draw its own conclusions, the lay opinion is not admissible." *State v. O'Brien*, 2013-Ohio-13, 986 N.E.2d 531, ¶ 45 (11th Dist.).

### a. Simon's and Grieser's testimony

**{¶ 106}** Looking first at Simon's and Grieser's testimony, we find that none of the testimony that Kamer objects to constituted an expert opinion. Regarding Simon's testimony, Kamer complains that Simon "opined as to [the child's] intelligence based upon viewing her forensic interview, her comfort with the interviewer, and set a general tone of credibility with no basis."[3] These were not expert opinions. They were simply Simon's observations based on what he saw during the child's forensic interview.

**{¶ 107}** A witness's testimony about another person's demeanor is proper lay opinion testimony if it meets the requirements of Evid.R. 701. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 85-86. Simon's statements meet the first requirement in the rule because they were rationally based on his perception of the

---

[3] We note that Kamer does not argue that Simon's testimony constituted an opinion about the child's truthfulness, which is an inadmissible lay opinion. *State v. Leigh*, 6th Dist. Ottawa No. OT-16-028, 2017-Ohio-7105, ¶ 24, citing *State v. Cooper*, 6th Dist. Lucas No. L-12-1296, 2014-Ohio-1294, ¶ 24; and *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 122.

44.

child. However, the statements were not helpful to a clear understanding of Simon's testimony or the determination of a fact in issue—i.e., "truly helpful to the jury"—so they were not properly admitted as lay opinion testimony. *O'Brien* at ¶ 45. But admission of these statements was not plain error because Simon's observations about the child's demeanor were not so prejudicial that the outcome of the trial would have been different if the statements had been excluded.

{¶ 108} Kamer also complains that Grieser "opined about [the child's] knowledge of sexual matters, her extreme detail, and her ability to correct any incorrect statements * * *." Before Grieser made these statements, she testified that she had interviewed approximately 3,000 children, including "[q]uite a few" under the age of 10. She then said that the child's level of detail was something that she "typically" did not see in "kids her age." These statements were rationally based on Grieser's observation of the child (and the other children she had interviewed in her career) and were helpful in explaining Grieser's testimony to the extent that the child's level of knowledge and detail informed Grieser's investigation and helped her reach the conclusion that the sexual abuse allegations were substantiated. Accordingly, we find that her statements were properly admitted.

{¶ 109} Additionally, because neither Simon nor Grieser testified as an expert, the state was not required to disclose their expert reports under Crim.R. 16(K), and Kamer's arguments to the contrary lack merit.

45.

### b. Martinez's testimony

{¶ 110} Turning to Martinez's testimony, Kamer contends that her testimony about the child's lack of injuries not being surprising, general information about the hymen, misconceptions about the state of a hymen and whether sexual penetration has occurred, and the likelihood that the child contracted a urinary tract infection as a result of sexual abuse all required expert opinions. As Martinez was neither qualified as an expert nor included any of that information in her report (i.e., the child's medical records from the sexual assault examination), Kamer argues that the trial court committed plain error by allowing the testimony.

{¶ 111} In response, the state argues that a SANE is permitted to testify as a lay witness—as Martinez did here—which means that Crim.R. 16(K) does not apply, and, regardless, that Martinez's testimony matched the information in the child's medical records.

### i. Nature of Martinez's testimony

{¶ 112} Before we can determine if Martinez testified in violation of Crim.R. 16(K), we must first determine whether she gave lay or expert testimony.

{¶ 113} Initially, we agree with the state that a SANE is permitted to testify as a lay witness. In fact, a nurse who conducts an examination and testifies only to the facts that she personally observed during that examination would be a lay witness like any other lay witness, and expert qualification would not come into play. Martinez did more

than testify to the facts that she observed during the child's sexual assault examination, however, so this does not end our inquiry.

{¶ 114} To testify as an expert, a witness must meet three criteria: (1) her testimony "either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons"; (2) the person is qualified to be an expert based on her "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony"; and (3) her testimony is "based on reliable scientific, technical, or other specialized information." Evid.R. 702(A)-(C). Experts are not confined to offering opinions only on matters that they have personally perceived. Evid.R. 703. "The distinction between lay and expert-witness opinion testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning that only specialists in the field can master." *State v. Lavender*, 2019-Ohio-5352, 141 N.E.3d 1000, ¶ 95, (1st Dist.), citing *State v. McKee,* 91 Ohio St.3d 292, 297, 744 N.E.2d 737, fn. 2 (2001).

{¶ 115} Here, Martinez provided opinion testimony about (1) the child's lack of injury being unsurprising because of the speed at which the vaginal area heals or because the assault consisted of only partial penetration, (2) the nature of hymens and dispelling a misconception about hymens, and (3) the potential origins of urinary tract infections. These opinions were not rationally based on things that Martinez had personally observed and are not "results from a process of reasoning familiar in everyday life * * *." *Id.*

47.

Indeed, these issues are beyond the knowledge and experience of a lay person altogether. *See State v. Carswell*, 6th Dist. Sandusky No. S-20-001, 2021-Ohio-3379, ¶ 56 (finding that a SANE's testimony about the likelihood of finding physical evidence of sexual assault is beyond the knowledge and experience of a layperson, so the SANE should have been qualified as an expert, not permitted to give lay opinion testimony); *compare State v. Jones*, 12th Dist. Warren No. CA2021-04-038, 2021-Ohio-4117, ¶ 40-41 (SANE testified that she took swabs from victim's anal area when the victim alleged a vaginal rape because gravity could cause semen to roll from one area to the other, which was permissible lay testimony because the fact that "gravity may cause a liquid, like semen, to move or be transferred from one part of the body to another is an observable fact that is a matter of common knowledge."). Consequently, Martinez's testimony went beyond lay opinion testimony and moved into the territory of expert opinion testimony.

{¶ 116} The state points to *State v. Belle*, 8th Dist. Cuyahoga Nos. 107046 and 107300, 2019-Ohio-787, to support its argument that Martinez's testimony was permissible lay opinion testimony, but *Belle* is distinguishable. In that case, appellant objected to the SANE's testimony about the general effect of trauma on a sexual assault victim's memory. *Id.* at ¶ 39. Although the SANE testified as a lay witness, before asking her questions about trauma and memory, the prosecutor elicited information about her training and experience regarding the "neurobiology of trauma," the effect of trauma on the brain, and how she had seen that manifest in sexual assault victims. *Id.* at ¶ 40-41. The Eighth District concluded that the SANE testified as a lay witness, but that her

48.

testimony was permissible because "[t]he state had laid a foundation demonstrating that she had a sufficient amount of experience and training and her testimony here was based on her personal knowledge and experience." *Id.* at ¶ 48.

{¶ 117} In contrast, Martinez's testimony did not include any comparable background or foundational information that allows us to conclude that her opinions meet the requirement in Evid.R. 701 that a lay opinion be "rationally based on the perception of the witness * * *." Martinez testified, generally, about the education and training that she received to become a registered nurse and complete SANE training—for example, she has a master's degree in nursing and took "64 hours of classroom training with some clinical training * * *" to complete her SANE course—but she did not testify, specifically, about anything that she learned in the course of her education and training. Nor did she provide details about how long she has been a nurse, how long she has been a SANE, or how many sexual assault examinations she has completed. [4] Unlike the testimony of the SANE in *Belle*, Martinez's opinions about (1) the child's lack of injury being unsurprising because of the speed at which the vaginal area heals or because the assault consisted of only partial penetration, (2) hymens, and (3) the potential origins of urinary tract infections lacked a "foundation demonstrating that she had a sufficient

---

[4] Based on Martinez's testimony that she is required to obtain a certain amount of continuing education hours every two years and that at her "last renewal, it was the sexual assault nurse examiner training—that I applied for that[,]" we infer that Martinez had been SANE-trained for only a short period of time.

49.

amount of experience and training and [that] her testimony here was based on her personal knowledge and experience." *Belle* at ¶ 48.

### ii. Crim.R. 16(K)

{¶ 118} Kamer argues that Martinez's expert testimony was inadmissible because the state did not provide a written report summarizing her opinions, as required by Crim.R. 16(K). Under Crim.R. 16(K), an expert witness is required to "prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion * * *" that "shall" be disclosed to opposing counsel at least 21 days before trial. "Failure to disclose the written report to opposing counsel *shall* preclude the expert's testimony at trial." (Emphasis added.) *Id.* The exclusion provision is mandatory, and the trial court is *required* to exclude any expert opinions that are beyond the scope of the expert's written report. *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 55 ("The plain language of Crim.R. 16(K) expressly provides the consequence for failing to disclose an expert's report as required: 'Failure to disclose the written report to opposing counsel *shall preclude* the expert's testimony at trial.'") (Emphasis sic.)).

{¶ 119} Martinez's only "report" is the copy of the child's medical records from the sexual assault exam. Despite the state's contention that Martinez's "testimony matched the information contained within her SANE report, which was provided to Kamer well before trial[,]" there is nothing in the child's medical records that addresses the likelihood of finding injuries from a sexual assault, the rate at which the genital area

50.

heals, the potential variations of hymens, the medical significance of the hymen, or the potential source of urinary tract infections. Because these opinions were not disclosed to the defense, Crim.R. 16(K) required the trial court to preclude Martinez's testimony about them at trial. Accordingly, the trial court erred by allowing Martinez to testify to these issues.

### iii.     Plain error

{¶ 120} The final step in our analysis of Martinez's testimony is determining whether the trial court's error in admitting Martinez's opinions that were beyond the scope of her report was plain error. We find that it was not.

{¶ 121} Plain error is error that affects substantial rights. Crim.R. 52(B). Three things are required to make an error a "plain error": (1) there must be an error, i.e., a deviation from a legal rule; (2) the error must be plain, i.e., the error "must be an 'obvious' defect in the trial proceedings"; and (3) the error must have affected a defendant's substantial rights, i.e., "the trial court's error must have affected the outcome of * * *" the proceedings. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 122} Here, we do not believe that Martinez's "expert" testimony affected the outcome of the case for three reasons. First, her testimony about the unsurprising lack of injury to the child's genitals was duplicative of Altstott's testimony about physical injuries to a child's genitals not being typical in a sexual abuse case, and Martinez's testimony was not so detailed or extensive that its introduction likely resulted in any additional prejudice to Kamer. Second, although Martinez provided some background information on the hymen, her ultimate conclusions were that the child did not have any acute injury to her hymen, which Martinez personally observed during her physical examination of the child and included in her report, and that she could "[n]ot at all" make a determination about whether or not the child had had sex based on the appearance of the child's hymen. Finally, although Martinez testified on direct that a urinary tract infection could be related to sexual abuse, she also testified on cross that there were other ways for bacteria to cause an infection.

{¶ 123} In sum, we cannot say that allowing Martinez to testify beyond her capacity as a lay witness affected the ultimate outcome of the trial, particularly because Alstott, a qualified expert, also testified to the most damning portion of Martinez's testimony—that it was unsurprising to find that the child did not have any genital trauma—and the rest of Martinez's testimony was not particularly prejudicial to Kamer.

{¶ 124} Accordingly, we find that the admission of Martinez's "expert" opinions was not plain error.

### c. Ineffective assistance

{¶ 125} Kamer's final argument within his fifth assignment of error relates to his trial counsel's failure to object to unspecified hearsay within Martinez's testimony. Although Kamer argues that his counsel was ineffective for failing to object, he does not specify what testimony that trial counsel should have objected to—other than the opinions discussed above, which were not hearsay. When the appellant fails to cite to specific instances in the record and fails to develop his argument regarding ineffective assistance, "[t]hat reason alone [is] sufficient to dispose of this assignment of error." *State v. Beach*, 6th Dist. Lucas No. L-02-1087, 2004-Ohio-5232, ¶ 57, citing App.R. 16(A). Therefore, we will not consider Kamer's ineffective assistance argument.

{¶ 126} For all these reasons, we find Kamer's fifth assignment of error not well-taken.

### 3. The trial court erred by permitting other-acts testimony that was not offered for a purpose permissible under Evid.R. 404(B).

{¶ 127} In his second assignment of error, Kamer argues that that trial court erred by allowing G.K. to testify that Kamer committed acts of abuse against her that are similar to those charged in the underlying case because the state's specified purposes for the testimony—identity and lack of mistake—were not material facts actually in dispute, and there was no substantial proof that Kamer committed the acts that G.K. testified to.

{¶ 128} The state responds that the trial court provided an appropriate limiting instruction to the jury, which the jury presumably followed, so Kamer was not prejudiced by any error the trial court might have committed by allowing G.K. to testify. The state

53.

also contends that Kamer's testimony put identity and absence of mistake at issue, so G.K.'s testimony was appropriately admitted. Alternatively, the state argues that any error the trial court made was harmless in light of the other evidence in the case.

{¶ 129} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." That evidence may be admissible for other, limited purposes, however, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

{¶ 130} To determine whether evidence of other acts is admissible, the first step is determining whether the evidence is relevant in two respects: (1) to the particular purpose for which it is offered—i.e., a non-character-based purpose, as allowed by Evid.R. 404(B)—and (2) to an issue that is actually in dispute—i.e., an issue that is material to the case, as required by Evid.R. 401. *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 37-38, citing *Hartman* at ¶ 26-27; *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. Additionally, a threshold showing of "'substantial proof'" that the defendant is the person who committed the alleged other acts is required as part of the court's relevancy determination. *Hartman* at ¶ 28, quoting *State v. Carter*, 26 Ohio St.2d 79, 83, 269 N.E.2d 115 (1971).

54.

{¶ 131} If the evidence passes the relevancy test, the final step to determining its admissibility is considering, under Evid.R. 403(A), whether the value of the evidence "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *Smith* at ¶ 38, citing *Hartman* at ¶ 29; *Williams* at ¶ 20. Generally speaking,

> [i]f the fact that the proponent seeks to prove by way of other acts is not genuinely disputed or material to the case, then it has little probative value and the risk of prejudice is high. As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases. (Emphasis sic and internal citations omitted.)

*Hartman* at ¶ 31.

{¶ 132} The admissibility of other-acts evidence under Evid.R. 404(B) is a question of law that we review de novo. *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 117, citing *Hartman* at ¶ 22. But the trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant under Evid.R. 403(A) involves an exercise of judgment, so we review that decision for an abuse of discretion. *Id.*, citing *Hartman* at ¶ 30.

{¶ 133} Here, the state asserted two bases for the admissibility of G.K.'s testimony: identity and absence of mistake.

55.

## a. Identity

{¶ 134} We first turn to whether the trial court properly admitted G.K.'s testimony as evidence of Kamer's identity.  Kamer argues that, because he was acquainted with the child, his identity was not a material issue in the case, so using G.K.'s testimony to prove his identity was error.  The state contends that Kamer's denial that he was the perpetrator put identity at issue, and the trial court properly admitted G.K.'s testimony to show that the child did, in fact, correctly identify Kamer as the perpetrator.

{¶ 135} Based on the relevancy of G.K.'s testimony, we find that it was not properly admitted as proof of Kamer's identity.  Other acts can be used to prove identity in two situations.  The first is when the other acts form part of the "immediate background" for the acts that are the basis of the crime charged in the indictment and are "inextricably related" to the charged crime.  (Internal quotations omitted.)  *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 88, citing *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994); and *State v. Curry*, 43 Ohio St.2d 66, 73, 330 N.E.2d 720 (1975).  The second is when the acts establish a modus operandi—a "unique identifiable plan of criminal activity * * *" with "signature, fingerprint-like characteristics unique enough to show that the crimes were committed by the same person."  (Internal quotations omitted.)  *Id.*, citing *Lowe* at 531; *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990), syllabus; and *Hartman* at ¶ 37.

{¶ 136} In this case, the events that G.K. testified to happened years before the acts charged in the indictment, at a time when G.K. was almost twice as old as the child

was when the child alleged that Kamer raped her, and in circumstances that share only partial similarities to the rapes that the child described. On balance, we cannot say that G.K.'s testimony provided "immediate background" information about the acts underlying the crimes in this case or that the acts G.K. testified to are "inextricably related" to the crimes in this case such that her testimony could be used to prove Kamer's identity as the perpetrator in this case. *Graham* at ¶ 88.

{¶ 137} Moreover, there is nothing in the acts alleged in this case or the acts that G.K. testified to that was so idiosyncratic, unique, or "truly distinctive [and] one-of-a-kind * * *" that it was "fingerprint-like" and could be used to identify Kamer, specifically, as the person who committed the offenses underlying this case. (Internal quotations omitted.) *See Hartman* at ¶ 37; *Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, at ¶ 42; *State v. Marshall*, 8th Dist. Cuyahoga No. 109633, 2021-Ohio-4434, ¶ 55-58. As such, G.K.'s testimony did not demonstrate that Kamer had a specific modus operandi, and her testimony was not properly used to identify him in that way.

### b. Absence of mistake

{¶ 138} The second nonpropensity purpose that the state put forth for G.K.'s testimony was showing an absence of mistake on Kamer's part. Such evidence is used to show that the defendant did not perform the acts underlying the indicted crimes "inadvertently, accidentally, involuntarily, or without guilty knowledge." (Internal quotation omitted.) *Hartman* at ¶ 52. Claims of mistake or accident in criminal cases generally occur in two ways: (1) when the defendant contends that no crime occurred at

57.

all, and (2) when the defendant contends that he did not act with the required criminal intent. *Id.* at ¶ 52-53. Here, we are dealing with the first scenario; that is, Kamer contends that he did not sexually assault the child.

{¶ 139} In *Hartman*, to illustrate the type of permissible Evid.R. 404(B) evidence when the defendant claims that no crime occurred, the Supreme Court provided the example of a man accused of poisoning his fourth wife and claiming that that she died of natural causes. *Id.* at ¶ 52. In that case, evidence of the man's first three wives dying with nearly identical symptoms could be admissible to show that the fourth wife died of poisoning because "the circumstances of the wives' deaths are so similar that it is improbable all four women died of natural causes." *Id.* Extending that logic to Kamer's case, for G.K.'s testimony to be relevant to proving absence of mistake, we must find that the circumstances of the rapes that G.K. testified to "are so similar that it is improbable * * *" that the rapes of the child were an accident. *See id.*

{¶ 140} When considered in that framework, it becomes apparent that absence of mistake was not a relevant Evid.R. 404(B) purpose for admitting G.K.'s testimony. Kamer did not deny that a crime occurred because there was an innocent explanation (such as the fourth wife in the *Hartman* example dying of natural causes) for what happened to the child; he denied that a crime occurred because he categorically denied having any contact with the child that could be construed as sexual and criminal. *Compare State v. Lewis*, 9th Dist. Summit No. 29696, 2021-Ohio-1575, ¶ 18 (evidence that appellant received hand jobs from the minor victim in the past was relevant to negate

58.

his explanation of events in his prosecution for unlawful sexual conduct with a minor when his defense was that no crime occurred because the victim performed fellatio on him while he was asleep).

{¶ 141} Moreover, the state's reliance on *Smith* is misplaced because the situation in *Smith* involved the second type of mistake described in *Hartman*, i.e., an act done without the requisite criminal intent. As the *Hartman* court explained, intent is an element of most crimes, so it is generally not a materially-disputed issue for purposes of other-acts evidence. *Hartman* at ¶ 55. "Thus, intent evidence is not admissible when * * * intent is not in issue at all, *such as when the defense theory is that the act never occurred*." (Emphasis added and internal quotations omitted.) *Id.*

{¶ 142} By way of comparison, in *Smith*, Smith admitted to having contact with his granddaughter, the victim, but offered non-criminal explanations for the contact. For example, he admitted to rubbing baby oil on his granddaughter but claimed that he did so only to relieve her itchy skin and that any contact he made with her private parts in the process was accidental. *Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, at ¶ 44. The Supreme Court determined that testimony from Smith's adult daughters about sexual abuse he had committed against one daughter approximately 30 years earlier was admissible to show that Smith's intent in touching his granddaughter was sexual gratification—which was a material issue in the case based on Smith's claims that his touching of his granddaughter was nonsexual—because of the striking similarities between Smith's molestation of his daughter and his granddaughter. *Id.* at ¶ 49.

59.

{¶ 143} Here, Kamer does not claim that he committed some innocent act that was misconstrued as criminal sexual conduct. He claims that he did not touch the child at all. Thus, his intent in touching the child—which, again, he claims that he did not do—was not at issue in the case. The state's arguments focus on the fact that Kamer alleged that *the child* and *G.K.* "were mistaken as to who raped and sexually molested them. Because it wasn't him." However, as the Supreme Court made clear in *Hartman* through its lengthy explanations of the appropriate uses of Evid.R. 404(B) evidence, the other-acts evidence must be used to show one of the nonpropensity purposes as it relates to the *defendant* (i.e., to show that the *defendant* did not make a mistake or had a certain intent). *See Hartman* at ¶ 37-63.

{¶ 144} Accordingly, G.K.'s testimony was not admissible to prove an absence of mistake under Evid.R. 404(B).

### c. G.K.'s testimony was inadmissible under Evid.R. 404(B).

{¶ 145} Because the state did not present G.K.'s testimony for a permissible, nonpropensity purpose, we find that her testimony was inadmissible under Evid.R. 404(B), and the trial court erred as a matter of law in allowing her to testify.

{¶ 146} The state argues, however, that any such error was necessarily harmless because the trial court gave limiting instructions regarding other-acts evidence, and this court should reject Kamer's second assignment of error on that basis "alone." We disagree.

60.

**{¶ 147}** The trial court instructed the jury regarding G.K.'s testimony twice: before G.K. testified and in the final jury instructions. Before G.K. testified, the court told the jurors:

> Evidence will be received in this matter now from this witness about the alleged commission of other acts other than the offense in which the defendant is charged in this trial. This evidence is being received for a limited purpose. It's not being received and you may not consider it to prove the character of the defendant in order to show that he acted in conformity or in accordance with that character. If you find that the evidence of these other acts is true, that the defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves the identity of the person who committed the offense in this trial. That evidence cannot be considered for any other purpose.

The instruction in the final charge was nearly the same, except that it told the jurors that they could consider the other acts "only for the purpose of deciding whether it proves the identity of the person who committed the offense in this trial or the absence of mistake." The court did not give any other instructions related to the other acts in G.K.'s testimony.

**{¶ 148}** We struggle to understand how these jury instructions—which specifically told the jury that it may consider other-acts evidence for purposes of proving the "identity of the person" or "the absence of mistake"—could somehow cure the prejudicial impact of evidence that *could not be considered* for either of those purposes

61.

under Evid.R. 404(B). The entire premise of these jury instructions was the trial court's mistaken belief that the jury "may consider" G.K.'s testimony for limited purposes under Evid.R. 404(B). In truth, the jury should not have heard G.K.'s testimony at all.

{¶ 149} Such limiting instructions, which often accompany the admission of other-acts evidence under Evid.R. 404(B), are not designed to "cure" any errors. Rather, they are designed to mitigate the prejudicial effect of evidence that is, presumably, *otherwise admissible* under Evid.R. 404(B) by explaining to the jury that it may consider the evidence or testimony for certain allowable, limited purposes only. Indeed, depending upon the facts and circumstances, evidence that is otherwise admissible under Evid.R. 404(B) may nonetheless be unduly prejudicial under Evid.R. 403(A)—and therefore inadmissible—in the absence of a properly-tailored limiting instruction. "[T]he trial court must decide whether the prejudicial effect of the other-acts testimony is such that it can be sufficiently mitigated by a well-tailored limiting instruction or, to the contrary, whether the effect of the testimony is so prejudicial that no instruction can temper its sway. If the latter is the case, the evidence must be excluded [under] Evid.R. 403(A)." *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 66.

{¶ 150} Here, there is no need to analyze whether the limiting instructions sufficiently mitigated the prejudicial effect of G.K.'s testimony by restricting the jury's consideration of that other-acts evidence to certain allowable purposes under Evid.R. 404(B). G.K.'s testimony was inadmissible under Evid.R. 404(B), so there was no allowable purpose for which it could be considered at all.

62.

{¶ 151} That said, even if we were to analyze the limiting instructions in this case, the trial court's instructions were not customized to the facts at issue and do not explain, in plain language, how other-acts evidence should be used by the jury. *Hartman* at ¶ 70. The Supreme Court of Ohio has directed that such limiting instructions should do more than tell the jurors that "they may not consider certain evidence 'to prove the character of the defendant in order to show that he acted in conformity with that character[.]'" *Id.* at ¶ 71, quoting *Ohio Jury Instructions*, CR Section 401.25. The court suggested that a trial court explain that

> the reason for this rule is that "it does not follow from the defendant's past acts that he committed the particular crime charged in this case," [*United States v. Gomez*, 763 F.3d 845, 861 (7th Cir.2014)]. And jurors would be well served by guidance connecting the limiting instruction to the state's burden of proof: the government has the burden of proving each element of *this particular crime* beyond a reasonable doubt, and its burden is not satisfied by an inference that the defendant committed this crime because his past acts suggest a propensity to commit crimes. *See id.* (Emphasis sic.)

*Id.*

{¶ 152} Here, although the trial court narrowed its limiting instruction to the purposes that the state claimed it was using G.K.'s testimony for (i.e., identity and absence of mistake), it did not go beyond using the pattern instructions in the *Ohio Jury*

*Instructions.* Thus, the "generic nature of the instruction that was given severely reduced its import in mitigating the prejudicial effect of the other-acts evidence." *Hartman* at ¶ 72.

{¶ 153} Regardless, as discussed, the other-acts evidence was inadmissible under Evid.R. 404(B). The issue, therefore, is whether the trial court's error in admitting this testimony was harmless error.

### d. The admission of G.K.'s testimony was not harmless error.

{¶ 154} Harmless error is "[a]ny error, defect, irregularity, or variance which does not affect substantial rights * * *." Crim.R. 52(B). The state bears the burden of proving that the error did not affect a defendant's substantial rights. *State v. Moore*, 2021-Ohio-765, 168 N.E.3d 921, ¶ 37 (6th Dist.), citing *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23; and *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15.

{¶ 155} When determining whether a trial court's improper admission of other-acts evidence affected the substantial rights of a defendant, an appellate court must (1) determine whether the error prejudiced the defendant (i.e., the error affected the verdict), (2) declare a belief that the error was not harmless beyond a reasonable doubt, and (3) excise the improper evidence from the record, look to the remaining evidence, and determine whether there is evidence beyond a reasonable doubt of defendant's guilt. *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37, citing *Morris* at ¶ 25, 27-29, 33. In other words, "an appellate court must consider both the impact of

64.

the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *Morris* at ¶ 33.

{¶ 156} First, we find that the admission of G.K.'s testimony prejudiced Kamer. Other-acts evidence admitted in violation of Evid.R. 404(B) is particularly likely to result in prejudice—that is, to affect the verdict—when "'the other acts are very similar to the charged offense or of an inflammatory nature.'" *State v. Sargent*, 2015-Ohio-704, 29 N.E.3d 331, ¶ 31 (6th Dist.), quoting *State v. Miley,* 5th Dist. Richland Nos. 2005-CA-67 and 2006-CA-14, 2006-Ohio-4670, ¶ 58. Prejudice is also more likely to result when the other acts are emphasized by the state in making its case against the defendant. *Morris* at ¶ 31 ("[T]he actions of a prosecutor may combine with an evidentiary error to cause greater impact.").

{¶ 157} G.K.'s testimony in this case met both of these criteria. Not only did G.K. testify that Kamer put his penis and finger in her vagina—which the state also accused Kamer of doing to the child—but the prosecutor also emphasized G.K.'s testimony and the "similarities" between G.K. and the child. Although the prosecutor compared the abuse that Kamer allegedly inflicted on the child and G.K. several times in her closing argument, one time was particularly egregious:

> The defendant had a relationship with both their mothers—two
> single mothers. They both came from broken homes. Clearly, neither one
> of these children have the idyllic white picket fence background. They both
> have difficult backgrounds. The defendant worked his way into these

65.

families to become a father-figure to both of these girls. They both called him dad. He abused them both when they were under ten years old—when they were little, little girls. They both said—Where did it happen? "The bedroom and bathroom." Nowhere else. Those were the two rooms that were used.

They both disclosed vaginal and digital penetration. Again, we remember the one finger. One finger. Not, I don't know. One finger they both specifically said. And neither one of them immediately disclosed.

In making these comparisons, the state was not attempting to identify Kamer or show that Kamer did not make a mistake; the state was attempting to show that Kamer raped the child like he had raped G.K. This argument directly played into the "long recognized" dangers of admitting other acts evidence, i.e., that the jury will convict the defendant not because he is guilty in this case, but "'because he is a person likely to do such acts'" or "'because he has escaped punishment from other offenses.'" *State v. Clemons*, 2017-Ohio-7980, 98 N.E.3d 1009, ¶ 15 (6th Dist.), quoting *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975). Thus, we find that G.K.'s testimony prejudiced Kamer and affected the verdict.

{¶ 158} Second, "an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt." *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 28. For the reasons already articulated, we firmly believe that G.K.'s testimony was not harmless beyond a reasonable doubt. "'Error in the admission of other

66.

act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction[.]'" *Id.*, quoting *State v. Lytle,* 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), paragraph three of the syllabus, *vacated in part on other grounds,* 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978). Here, given the extremely prejudicial nature of the evidence at issue, there is no reasonable possibility that G.K.'s testimony—as emphasized by the prosecutor—*did not* contribute to Kamer's conviction.

{¶ 159} Finally, we must excise the improper evidence and look at the remaining evidence in the case to determine whether there is evidence beyond a reasonable doubt of Kamer's guilt. "'[C]ases where imposition of harmless error is appropriate must involve either [(1)] overwhelming evidence of guilt or [(2)] some other indicia that the error did not contribute to the conviction.'" *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5. Our role in this inquiry is "'not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony upon the jury.'" *Morris* at ¶ 29, quoting *Rahman* at 151, fn. 4.

{¶ 160} Importantly, we note that G.K.'s testimony is not the only "improper evidence" to be excluded from the record for this analysis. As discussed further below, we find that certain hearsay evidence was improperly admitted and likely affected the verdict in this case as well. For that reason, we must first address the admissibility of the

67.

hearsay evidence before we analyze whether the *properly*-admitted evidence, alone, amounts to overwhelming evidence of Kamer's guilt.

### 4. The trial court erred by admitting the child's incriminating statements through hearsay testimony.

{¶ 161} In his first assignment of error, Kamer argues that the trial court erred by allowing Simon and Grieser to testify to statements made by the child during the forensic interview. His argument has two prongs. First, Kamer argues that the child's statements that Simon and Grieser testified to after the child "shut down" during her trial testimony and was unable or unwilling to provide the jury with any testimony that incriminated Kamer are all hearsay statements that do not fall within any exceptions to the hearsay rule. Second, he argues that the admission of the hearsay statements violated his Sixth Amendment right to confront the witnesses against him because the statements were testimonial and the child was an available—albeit reluctant—witness. Or, alternatively, if the child's apparent inability to recall the events that happened in the motel made her unavailable as a witness, the state failed to have the court declare the child unavailable before it elicited the testimonial hearsay.

{¶ 162} The state responds that the child was available for cross-examination, and Kamer had an opportunity to cross-examine the child—an opportunity that he chose to forgo—which makes any contested hearsay statements admissible and is all that is required to protect a defendant's Confrontation Clause rights.

{¶ 163} Kamer's assignment of error involves the related, but distinct, issues of confrontation and hearsay. We will first address Kamer's argument that his right to

68.

confront the child was violated by the trial court's admission of the child's statements through the testimony of other witnesses.

### a. Confrontation Clause argument

{¶ 164} The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless [she] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. We review de novo evidentiary rulings that implicate the Confrontation Clause. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.

{¶ 165} Generally, the first step in a Confrontation Clause analysis is determining whether the statements at issue are testimonial because "the Confrontation Clause does not apply to nontestimonial hearsay * * *." *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21, citing *Crawford* at 68. We need not conduct such an analysis here, however, because the child testified at trial and was subject to cross-examination, which remedies any potential Confrontation Clause violation.

{¶ 166} "'[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [her] prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the

69.

declarant is present at trial to defend or explain it.'" (First brackets sic.) *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 127, quoting *Crawford* at 59, fn. 9; and citing *California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *State v. Lykins*, 4th Dist. Adams No. 18CA1079, 2019-Ohio-3316, ¶ 90 ("[T]he Confrontation Clause does not require exclusion of prior statements of a witness who testifies at trial."). This is because a defendant's right to confront the witnesses against him "has long been read as securing an adequate opportunity to cross-examine adverse witnesses." *United States v. Owens*, 484 U.S. 554, 557, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). The "opportunity" to cross-examine a witness exists when the declarant testifies and the defendant is not "'prohibited from engaging in otherwise appropriate cross-examination.'" *McKelton* at ¶ 172, quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

**{¶ 167}** The fact that a defendant chooses to forgo cross-examination of a witness does not deprive him of his opportunity to cross-examine that witness, and, consequently, does not amount to a Confrontation Clause violation. *State v. Jordan*, 10th Dist. Franklin No. 06AP-96, 2006-Ohio-6224, ¶ 25 ("Although appellant ultimately chose not to fully cross-examine [the victim] at trial on the subject of these prior, out-of-court statements * * *, she did testify, and appellant had the *opportunity* for effective cross-examination. Because the Confrontation Clause guarantees only an *opportunity* for cross-examination, the fact that a defendant has chosen not to avail himself of the opportunity does not violate the Confrontation Clause." (Emphasis sic.)); *see also State v. Grate*, 164 Ohio

70.

St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 148, quoting *State v. Otte*, 74 Ohio St.3d 555, 565, 660 N.E.2d 711 (1996) (Counsel's decision to not cross-examine a witness is a strategic decision that is "'firmly committed to the trial counsel's judgment * * *.'" (Ellipsis sic.)). This is because the Confrontation Clause's guarantee of an opportunity to cross-examine does not also guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Internal quotations omitted.) *Owens* at 559.

{¶ 168} Here, the state presented the child as a witness and was able to elicit some—albeit very little—information from her regarding the sexual acts that the state charged Kamer with committing. Following the child's testimony, Kamer had an *opportunity* to cross-examine the child about her testimony, which is all that is required to satisfy the Confrontation Clause; it is irrelevant for confrontation purposes that Kamer chose *not* to cross-examine the child.

{¶ 169} Kamer argues that the state's failure to attempt to refresh the child's recollection of the abuse left him "with no means to engage in any sort of meaningful cross examination since the available witness did not testify to any of the facts that would later be asserted against him." He does not, however, supply any case law to support this argument or point to anything in the record showing that he was, in fact, prevented from cross-examining the child about the allegations that she made in the forensic interview (which was provided to Kamer in discovery). *See* Evid.R. 611(B) ("Cross-examination shall be permitted on all relevant matters and matters affecting credibility."). Indeed,

considering that the child's testimony was less than damning, it is highly likely that counsel strategically chose not to ask her questions to prevent her from providing more damaging testimony or to avoid alienating the jury. *See State v. Wilson*, 2017-Ohio-5724, 93 N.E.3d 1282, ¶ 29 (5th Dist.).

{¶ 170} Based on the record, we cannot find that Kamer's confrontation argument has merit.

### b. Hearsay arguments

{¶ 171} In the other part of this assignment of error, Kamer argues that the child's statements from the forensic interview are inadmissible hearsay that do not fall under any exceptions to the hearsay rule, and the trial court therefore erred when it allowed these statements to come into evidence through Simon's and Grieser's testimony.

{¶ 172} Hearsay is a statement made by someone, other than the declarant, while testifying that is "offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). An out-of-court statement is not considered hearsay and is admissible if it is offered for a different purpose, however. *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 118. "On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule, rather than the more deferential review employed for discretionary rulings" because "[w]hile there is discretion to admit or exclude relevant evidence, there is no 'discretion' to admit hearsay." *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 29, 32 (6th Dist.), citing *State v. Sutorius*, 122

72.

Ohio App.3d 1, 7, 701 N.E.2d 1 (1st Dist.1997); and *State v. Sorrels*, 71 Ohio App.3d 162, 165, 593 N.E.2d 313 (1st Dist.1991).

{¶ 173} The state claims that a hearsay analysis is not required because "this Court, the Supreme Court of Ohio, and the Supreme Court of the United States have consistently held that so long as the declarant of the alleged hearsay statements was available to be cross examined, those contested statements are admissible."  We disagree.  The case law actually says that there is no *Confrontation Clause violation* when the declarant testifies and the defendant has an opportunity for cross-examination.  *See, e.g., State v. Siddell*, 6th Dist. Erie Nos. E-05-094 and E-05-095, 2007-Ohio-1875, ¶ 13, citing *Green*, 399 U.S. at 157-158, 90 S.Ct. 1930, 26 L.Ed.2d 489; and *State v. Leonard,* 104 Ohio St.3d 54, 75, 2004-Ohio-6235, ¶ 110.  It is not, as the state suggests, a blanket exception to the hearsay rule.

{¶ 174} In other words, unless an exception to the hearsay rule applies, a trial court errs by admitting hearsay into evidence—even if the admission of that hearsay does not violate the Confrontation Clause because the declarant testified.  *State v. Keenan*, 81 Ohio St.3d 133, 142, 689 N.E.2d 929 (1998) (determining that the admission of hearsay was "[n]onconstitutional error"[5] even though there was no Confrontation Clause violation because the declarant testified).  Of course, this error may be *harmless* error under certain

---

[5] As the Ohio Supreme Court recognized in *Harris*, "the majority [in *Morris*] dispensed with the distinction between constitutional and nonconstitutional errors under Crim.R. 52(A)."  *Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, at ¶ 37, citing *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 22-24.

73.

circumstances, including situations in which "'the declarant was also a witness and examined regarding matters *identical to those contained in the hearsay statements*.'" (Emphasis added.) *State v. F.R.*, 2015-Ohio-1914, 34 N.E.3d 498, ¶ 37 (10th Dist.), quoting *State v. Smith,* 2d Dist. Montgomery No. 20828, 2006-Ohio-45, ¶ 16.

{¶ 175} Accordingly, contrary to the state's arguments, we must analyze whether the hearsay rules permitted Simon and Grieser to testify regarding the child's out-of-court statements.

i.      **Simon's testimony went beyond explaining the course of his investigation.**

{¶ 176} Regarding Simon's testimony about the child's out-of-court statements, the trial court overruled Kamer's hearsay objections because the statements were "offered as a matter of establishing what happened in the investigation." Out-of-court statements to explain police conduct during the investigation of a crime are not hearsay and are admissible if they satisfy three criteria: (1) the conduct the officer is trying to explain is "relevant, equivocal, and contemporaneous with the statements"; (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice; and (3) "the statements cannot connect the accused with the crime charged." *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27. Rather than directly linking the defendant to the crime he is on trial for, statements used to explain an officer's investigatory conduct should provide "general background to explain what had led the police to begin an investigation * * *" or take the next investigatory step. *Id.* at ¶ 20. These limits are placed on the admission of such statements because of "the great

74.

potential for abuse and potential confusion to the trier of fact." *State v. Humphrey*, 10th Dist. Franklin No. 07AP-837, 2008-Ohio-6302, ¶ 11.

{¶ 177} The bulk of Simon's testimony does not meet these criteria. First and foremost, Simon did not connect the majority of the child's statements to how he conducted his investigation. Simon testified that he knew about allegations of sexual abuse against Kamer—and began his investigation—before mother scheduled the forensic interview, and he learned from speaking to mother before the forensic interview all of the necessary "initial information, the demographics of the family, * * *" which included "any details that the mother may have at that point * * *, who lived in the residence, who the victim had contact with regularly[,] * * * when mom worked." Based on that initial interview with mother, Simon learned that the child lived with mother, her sibling, and Kamer, that she called Kamer dad, and that she also had regular contact with grandfather and step-grandmother. Simon also said that he interviewed Kamer, but did not pursue any other suspects in this case, which was based, at least in part, on Kamer's own statement that "the only men that were around [the child] was [sic] himself and grandpa." None of the child's statements that Simon testified to would have affected these steps.

{¶ 178} The other investigative steps that Simon testified to were obtaining recordings of Kamer's phone calls to mother, retrieving a copy of the SANE's report from the hospital, getting a search warrant for Kamer's cellphone, and reinterviewing mother. Getting the phone calls and the SANE's report did not require Simon to testify

75.

about the specific statements that the child made during the forensic interview; nothing in the child's statements could have pointed him in the direction of the calls or the report.

{¶ 179} Regarding the search warrant and the second interview with mother, however, two of the statements that Simon testified to meet the "relevant, equivocal, and contemporaneous" requirement. The first is the child's statement that some of the abuse happened at night while mother was working. This led Simon to conduct his second interview with mother to find out when she worked night shifts. The second is the child's statement that she watched people having sex on Kamer's phone. This led Simon to obtain a search warrant for Kamer's cellphone to look for evidence that he had, in fact, shown the child pornography. Although the child's statement about watching people having sex on Kamer's phone was relevant and contemporaneous to Simon's decision to get a search warrant, and was equivocal because his decision to get the search warrant needed some explanation, Simon's testimony about the child saying that Kamer would give her his phone and tell her to "[j]ust relax and watch TV" before molesting her did not meet these criteria.

{¶ 180} Second—and more importantly—Simon's recounting of the child's statements very clearly "connect[ed Kamer] with the crime charged." *Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, at ¶ 27. The first thing that Simon said about the interview was that "[w]e learned of multiple disclosers [sic] of penetration to [the child] by Mr. Kamer, who she named." He went on to describe specific instances of sexual conduct that the child disclosed, including a time when the child "used her hands

on Mr. Kamer," times when "she touched him with her mouth," and "[o]ther times he inserted his penis into her vagina and into her butt." Simon's testimony about the child watching people have sex on Kamer's phone also directly connected Kamer to charged crimes.

{¶ 181} Finally, the probative value of these statements is not substantially outweighed by the danger of unfair prejudice to Kamer. In this context, "the analysis of prejudice serves the ultimate question of whether the testimony was offered for the truth of the matter asserted." *Id.* at ¶ 26. Here, there is no question that "the nonhearsay reason given for introducing the statements was a pretext for the real reason: connecting [Kamer] to the crime." *Id.* at ¶ 34. That is, the state offered Simon's testimony about the child's statements at the forensic interview to prove the truth of the statements—to prove that Kamer raped the child. Although two of the child's statements actually explained why Simon took certain steps in his investigation, because the state was unable to elicit incriminating testimony from the child at trial, the primary purpose of putting that information in front of the jury was proving that Kamer committed the crimes that he was charged with. Thus, we find that the probative value of the statements did not substantially outweigh the danger of unfair prejudice.

{¶ 182} Because most of Simon's testimony about the child's statements does not meet the criteria to explain police conduct during an investigation, we find that the testimony—with the exception of the statement that two unspecified "instances"

77.

happened at night while mother was working—was hearsay, and the trial court erred by admitting it.

### ii. Grieser's testimony did not fall within any hearsay exceptions.

{¶ 183} Next, the trial court overruled Kamer's hearsay objections to Grieser's testimony about the child's statements because the child "was here, was subject to cross-examination, so it is not hearsay." A declarant's prior statement is not hearsay if she testifies at trial, is subject to examination about the statement, and the statement is:

> (a) inconsistent with declarant's testimony, and was given under oath
>
> subject to examination by the party against whom the statement is offered
>
> and subject to the penalty of perjury at a trial, hearing, or other proceeding,
>
> or in a deposition, or (b) consistent with declarant's testimony and is
>
> offered to rebut an express or implied charge against declarant of recent
>
> fabrication or improper influence or motive, or (c) one of identification of a
>
> person soon after perceiving the person, if the circumstances demonstrate
>
> the reliability of the prior identification.

Evid.R. 801(D)(1). The child's statements in the forensic interview do not fall under this rule because the statements were not sworn and subject to examination by Kamer, offered to rebut a charge of recent fabrication or improper influence or motive, or statements identifying Kamer soon after perceiving him. Thus, the statements were hearsay and were only admissible if they fell under an exception to the hearsay rule.

78.

{¶ 184} The exceptions to the hearsay rule are found in Evid.R. 803 and 804. The state did not argue in its brief that any hearsay exceptions apply to Grieser's testimony, but suggested at oral argument that the exception in Evid.R. 803(3) for the declarant's then existing mental, emotional, or physical condition was applicable. This exception excludes from the hearsay rule "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *but not including a statement of memory or belief to prove the fact remembered or believed * * *.*" (Emphasis added.) *Id.* We do not agree that this exception applies.

{¶ 185} The child's statements, as relayed by Grieser, did not relate to the child's state of mind or emotional, mental, or physical condition at the time of the interview. The statements related to things that had happened to the child in the past that she was recalling for Grieser—i.e., incidents when Kamer "put his vagina inside [the child's] vagina," "inserted his finger inside of her vagina," and "put his penis inside of her butt"—and the state offered them to prove that Kamer had sexually abused the child. Thus, the child's statements were "statement[s] of memory" and were introduced by the state to "prove the fact[s] remembered * * *," which takes them outside of the hearsay exception in Evid.R. 803(3). Accordingly, the trial court erred in admitting these statements.

79.

### 5. There is not overwhelming evidence of guilt after the inadmissible and prejudicial evidence is excised from the record.

{¶ 186} As we summarized when analyzing the impact of G.K.'s inadmissible testimony, an error does not affect a defendant's substantial rights under Crim.R. 52(A) unless (1) the error was prejudicial, (2) the error was not harmless beyond a reasonable doubt, and (3) after excising the improper evidence from the record and looking to the remaining evidence, we determine there is evidence beyond a reasonable doubt of defendant's guilt. *Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, at ¶ 37, citing *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 25, 27-29, 33. Importantly, after "excis[ing] the improper evidence from the record * * *," there must be "'either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.'" *Morris* at ¶ 29, quoting *Rahman*, 23 Ohio St.3d at 151, 492 N.E.2d 401. The state bears the burden of demonstrating that the error did not affect the defendant's substantial rights. *Id.* at ¶ 23.

{¶ 187} First, it is highly likely that the inadmissible hearsay affected the verdict. Although the state argues that the hearsay was necessarily harmless because Kamer "confessed" to molesting the child in the recorded jail phone calls, we disagree with the state's interpretation of these calls. When considered in the context of the conversations with mother, Kamer's statements—while susceptible to an interpretation that implies Kamer's guilt—could also be reasonably interpreted in another fashion. That is, Kamer was encouraging mother to have the child examined because he (and mother) believed that an examination would definitively determine whether someone had molested the

80.

child.  During the calls, Kamer indicated that he was worried that the inevitable involvement of "police officers" meant that he would be "fucked" as soon as "[his] name" was mentioned—even though he repeatedly assured mother, during those same calls, that he would never harm the child.  At trial, he explained that he had been in prison with many men who told him that if he went "'in front of them with a sex case, no matter what, they're going to find you guilty.'  * * * So, I am terrified of this."  Kamer's explanation was a matter of credibility for the jury.  Given the ambiguous nature of Kamer's recorded statements, the jail-house recordings are not the smoking gun that the state claims they are.

{¶ 188} Moreover, this is not a situation where the admission of hearsay was harmless because the declarant was "'examined regarding matters *identical* to those contained in the hearsay statements.'"  (Emphasis added.)  *F.R.*, 2015-Ohio-1914, 34 N.E.3d 498, at ¶ 37, quoting *Smith*, 2d Dist. Montgomery No. 20828, 2006-Ohio-45, at ¶ 16.  Although the state *attempted* to examine the child regarding abuse by Kamer, the child never testified to the specific sex acts that Simon and Grieser described in their testimony.  In fact, the closest the child came to testifying about the abuse was answering "Gregory" when the prosecutor asked if "somebody touched [the child's] private parts that [she] didn't want them to[.]"  While the child provided some peripheral details—i.e., that the abuse happened in the motel room and while mother was at work—she did not give the same graphic and explicit details that were present in the hearsay that Simon and

Grieser testified to. Thus, we cannot say that the child was "'examined regarding matters *identical* to those contained in the hearsay statements.'" (Emphasis added.) *Id.*

{¶ 189} In addition, we cannot say that the hearsay was duplicative of admissible testimony, which could have reduced its prejudicial effect. *See State v. Awkal*, 76 Ohio St.3d 324, 331, 667 N.E.2d 960 (1996) (admission of hearsay testimony was harmless when the hearsay was duplicative of admissible testimony). Again, Simon's and Grieser's testimony provided specific detail regarding Kamer's alleged conduct that was absent from the child's testimony, the admissible information in Martinez's testimony and the sexual assault examination records, or any other admissible evidence. Accordingly, we find that the admission of the hearsay prejudiced Kamer.

{¶ 190} Second, we cannot say that the admission of this hearsay was harmless beyond a reasonable doubt. That is, we cannot say that "'there is no reasonable possibility that the testimony contributed to the accused's conviction.'" *Morris* at ¶ 28, quoting *Lytle,* 48 Ohio St.2d 391, 358 N.E.2d 623, at paragraph three of the syllabus. To the contrary, for the reasons already stated, given the prejudicial nature of this testimony, there is no reasonable possibility that this testimony *did not* contribute to the convictions in this case.

{¶ 191} On this point, we disagree with the state's argument that the trial court allowing Simon and Grieser to testify to the child's hearsay statements was harmless beyond a reasonable doubt because the substance of those statements came into evidence through Forgac's expert report. Although an expert may testify to his opinion based on

82.

facts or data "perceived by the expert or admitted in evidence at the hearing," Evid.R. 703, "the rule does not grant blanket admissibility to those underlying facts or data if they are not otherwise admissible under the Rules of Evidence." *Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, at ¶ 188, citing *Lorence v. Goeller*, 9th Dist. Lorain No. Civ.A. 04CA008556, 2005-Ohio-2678, ¶ 44. While "foundational facts" from hearsay statements may be admissible to "inform the jurors of the bases for * * *" the expert's opinion, the statements themselves are not admissible. *Id.* at ¶ 189.

{¶ 192} The child's statements that Forgac repeated in his report were inadmissible hearsay. And, although the statements were before the jury because Forgac's report was admitted as an exhibit, Forgac did not repeat the child's statements while he was testifying or have first-hand knowledge of the statements from observing the child's interview in person—like Simon and Grieser did. Both of these factors likely gave Simon's and Grieser's repetition of the child's statements significant weight to the jury, so we cannot conclude that the admission of Forgac's report rendered Simon's and Grieser's testimony harmless beyond a reasonable doubt.

{¶ 193} As the third and final step, we must excise the inadmissible hearsay that was testified to by Simon and Grieser, as well as G.K.'s testimony (which, as determined above, was inadmissible under Evid.R. 404(B), prejudicial, and not harmless beyond a reasonable doubt). Then, we must consider the remaining evidence, and determine whether there is nonetheless evidence of Kamer's guilt beyond a reasonable doubt. *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 29; *Harris*, 142 Ohio

83.

St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, at ¶ 37. ""'"[C]ases where imposition of harmless error is appropriate *must* involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.""'" (Emphasis added.) *Morris* at ¶ 29, quoting *Rahman*, 23 Ohio St.3d at 151, 492 N.E.2d 401, quoting *Ferguson,* 5 Ohio St.3d at 166, 450 N.E.2d 265, fn. 5.

{¶ 194} Here, the strongest evidence supporting Kamer's convictions consists of Martinez's testimony and her sexual assault examination report, which both recited the child's report that Kamer put his penis in her vagina and that she put her hand on Kamer's penis; the child's testimony at trial that "Gregory" had touched unspecified private parts while they were living at the motel and had done so while mother was at work and the sibling was sleeping; and mother's testimony—that Kamer does not assign as error on appeal—that the child told her that Kamer put his mouth on her vagina. Mother also made a comment in one of the recorded phone calls that the child had told her step-grandmother that Kamer put his penis in the child's mouth. With respect to Simon and Grieser, after excising the inadmissible hearsay, we are basically left with Simon's testimony that the child reported two unspecified "incidents" that happened at night while mother was at work, and that mother worked on two specific nights in July 2019.

{¶ 195} Although this evidence is sufficient to sustain the convictions, we are mindful that our task is to determine whether the state has satisfied its burden to demonstrate that the evidence was *so overwhelming* that there is *no reasonable possibility*

84.

that the jury could have been influenced by the inadmissible other-acts evidence or hearsay testimony and, therefore, the evidentiary errors were harmless *beyond a reasonable doubt. See State v. Miller*, 2020-Ohio-3854, 156 N.E.3d 297, ¶ 42-43 (11th Dist.), quoting *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78 (Whether an error is "'harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction'"; only "'other evidence of guilt'" that is "'overwhelming'" is sufficient to meet this standard.); *State v. Patterson*, 5th Dist. Stark No. 2017CA00022, 2017-Ohio-8970, ¶ 38, citing *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 39 (error in admitting other-acts evidence is harmless when there is other overwhelming evidence of the defendant's guilt).

{¶ 196} Here, in addition to the evidence summarized above, the trial included testimony from two experts with opposing opinions regarding two important issues—source-monitoring errors and physical findings of sexual abuse. The possibility that the child may have made "source-monitoring errors"—which Forgac described as a "mistake of claiming an experience that they had when it wasn't an experience they had, it was an experience that they saw"—was an issue in this case because mother and Kamer had vaginal and oral sex in the motel room on multiple occasions while the child was present. Although mother and Kamer testified that they took precautions (i.e., stacking pillows and using a cardboard petition), there was conflicting testimony regarding whether the

85.

child saw mother and Kamer engaging in sex on a regular basis, which (according to Forgac) could have led to the child experiencing source-monitoring errors related to her reports of abuse. And, the two experts had differing views regarding whether source-monitoring errors were likely in this case. Alstott testified that the child demonstrated other indications that she was a victim of sexual abuse, making it unlikely that source-monitoring errors were responsible for her reports of abuse. Forgac, on the other hand, testified that source-monitoring errors are common at the child's age and stage of development, and, given the child's exposure to nudity and sexual activity in the motel room, it was possible that the child believed that abuse happened to her when it did not, which affected the trustworthiness of the child's reporting. In addition, while physical indications of abuse are not required for conviction, Alstott and Forgac offered differing expert opinions regarding whether there should have been physical indications of abuse in this particular case. Finally, we cannot ignore the fact that the trial testimony raised issues regarding the respective credibility of the child and Kamer, which is critically important in a case like this.

{¶ 197} Based on this record, we cannot say that the state met its burden to demonstrate that the admissible evidence, alone, is so overwhelming that there is no reasonable possibility that the inadmissible evidence contributed to the jury's decision-making in this case. To the contrary, it is highly likely that the jury was influenced by (1) the testimony of two additional state's witnesses regarding the child's specific, out-of-court disclosures of abuse that are not otherwise contained in the record and that were

86.

submitted after the child could not or would not repeat the majority of her allegations in court, and (2) G.K.'s inadmissible other-acts testimony, as emphasized by the prosecutor, that Kamer had raped her as a child. *See State v. Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, ¶ 24 (Finding that improper admission of expert testimony "bolstered the [victims'] testimony by lending it credibility in a case without any physical evidence against the defendant, thus likely impacting the jury's verdict."); *Clemons*, 2017-Ohio-7980, 98 N.E.3d 1009, at ¶ 16 (In a case that hinged on witness credibility, erroneous admission of other-acts evidence "tipped the scales in [the victim's] favor by inviting the jury to conclude that appellant was guilty of the charge simply because he had allegedly committed similar acts in the past.").

{¶ 198} For these reasons, we conclude that the trial court's errors with respect to the testimony of G.K., Simon, and Grieser were not harmless beyond a reasonable doubt and mandate reversal of Kamer's convictions.

### 6. Evidentiary assignments of error conclusion

{¶ 199} In sum, because Kamer was prejudiced by the admission of G.K.'s improper Evid.R. 404(B) testimony and by the hearsay statements in Simon's and Grieser's testimony, and because the state has not met its burden to demonstrate that these errors were harmless beyond a reasonable doubt, we find that Kamer's first assignment of error is well-taken, in part, and his second assignment of error is well-taken. Kamer's first assignment of error is not well-taken as it relates to his

87.

Confrontation Clause arguments, and his third and fifth assignments of error are not well-taken.

### B. Kamer's indictment is not constitutionally defective.

{¶ 200} In his fourth assignment of error, Kamer contends that his indictment was impermissibly vague because it contained two sets of "carbon copy" charges, which were identical except for the date ranges, and the state did not provide a bill of particulars to clarify what he was accused of in each specific charge. He claims that this violated his due process rights and resulted in his convictions not being supported by sufficient evidence, requiring us to reverse his convictions. He also argues that he cannot be retried on any of the counts because the undifferentiated charges, combined with the jury acquitting him of one set of charges and convicting him of the other, means that "[i]t will never be possible to untangle the charges and conduct a trail [sic] wherein it will be known, for a certainty, that the jury will render its verdict based only upon acts for which Mr. Kamer was not acquitted * * *."

{¶ 201} The state responds that Kamer's indictment meets the requirements for an indictment in R.C. Chapter 2941 and Crim.R. 7(B), it is irrelevant that each type of rape that Kamer was accused of could not be matched to a specific count in the indictment, and the state was not required to provide a bill of particulars because the prosecutor's office has an open-file discovery policy.

{¶ 202} Kamer did not object to any defects in his indictment in the trial court—which waives all but plain-error review on appeal. *State v. Barker*, 6th Dist. Lucas No.

88.

L-14-1032, 2015-Ohio-3615, ¶ 22; *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 46. In addition, "[a] defendant who has requested a bill of particulars waives error by proceeding to trial without receiving the bill or requesting a continuance." *State v. Hickle*, 6th Dist. Ottawa No. OT-03-034, 2004-Ohio-5250, ¶ 15. Accordingly, we review this assignment of error for plain error.

{¶ 203} Any facts that are not elements of the charged crime are not required in the indictment; disclosing such facts is the function of a bill of particulars. *State v. Miller*, 2018-Ohio-3430, 118 N.E.3d 1094, ¶ 17 (7th Dist.), citing *State v. Pepka*, 125 Ohio St.3d 124, 2010-Ohio-1045, 926 N.E.2d 611, ¶ 23. However, generally speaking, no bill of particulars is required where, as here, the state allows open-file discovery. *State v. Haynes*, 6th Dist. Wood No. WD-19-035, 2020-Ohio-6977, ¶ 48, *appeal allowed*, 162 Ohio St.3d 1437, 2021-Ohio-1399, 166 N.E.3d 1255, citing *State v. Coffey,* 6th Dist. Lucas No. L-12-1047, 2013-Ohio-3555, ¶ 35; and *State v. Franklin,* 5th Dist. Muskingum No. CT2019-0042, 2020-Ohio-1263, ¶ 63-71.

{¶ 204} An indictment is constitutionally sufficient if it contains the elements of the offense, gives the defendant adequate notice of the charge he must defend against, and protects the defendant against double jeopardy by "'enabl[ing] him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Resendiz-Ponce*, 549 U.S. 102, 108, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007), quoting *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *State v. Hayes*, 6th Dist. Lucas No. L-14-1249, 2016-Ohio-330, ¶ 14. An indictment that

tracks the language of the statute the defendant is accused of violating is generally sufficient to meet these requirements. *State v. Jackson*, 134 Ohio St.3d 184, 2012-Ohio-5561, 980 N.E.2d 1032, ¶ 14, citing *State v. Childs,* 88 Ohio St.3d 194, 199, 724 N.E.2d 781 (2000); and *State v. Murphy,* 65 Ohio St.3d 554, 583, 605 N.E.2d 884 (1992); *see also* R.C. 2941.05; Crim.R. 7(B).

{¶ 205} Here, Kamer's indictment meets the first two sufficiency requirements. It clearly and plainly lists the essential elements of each offense in terms of each statute he is accused of violating. Although the charges do not specify the sex acts that each charge is based on, the nature of the sex acts that the state charged Kamer with committing had no bearing on the identity or degree of the offenses—and thus were not essential elements of the crimes—so the state was not required to include the specific acts in the indictment. *State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, ¶ 20. And "[t]here is no inherent defect in an indictment that charges a defendant with repetition of the same crime over a defined period of time * * *." *State v. Billman*, 7th Dist. Monroe Nos. 12 MO 3 and 12 MO 5, 2013-Ohio-5774, ¶ 33.

{¶ 206} However, whether Kamer's indictment meets the constitutional sufficiency element—i.e., that it "enable an accused to protect himself or herself from any future prosecutions for the same incident"—is not so clear-cut. *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, ¶ 7.

{¶ 207} This issue is the crux of Kamer's argument related to his indictment. In support, he cites *Valentine v. Konteh*, 395 F.3d 626 (6th Cir.2005). In that case,

90.

Valentine was convicted in the trial court of 20 counts of rape and 20 counts of felonious sexual penetration. All of the charges were alleged to have occurred over a period of approximately 10 months, and each count of rape "was identically worded so that there was no differentiation among the charges * * *," as was each count of felonious sexual penetration. *Id.* at 628, 629. Although the state provided Valentine with a bill of particulars, it "merely restated the allegations and identified the family home as the location of all forty offenses." *Id.* at 629. At trial, the child victim did not testify to specific instances of abuse; instead, the victim "described typical abuse scenarios and estimated the number of times the abusive offenses occurred, e.g., 'about 20,' 'about 15' or 'about 10' times." *Id.* at 628. The jury found Valentine guilty of all 40 charges. *Id.* at 629. The Eighth District Court of Appeals affirmed all 20 rape convictions, but only 15 of the 20 felonious sexual penetration convictions "presumably based [upon] the child's testimony that Valentine had digitally penetrated her vagina 'about fifteen' times." *Id.*

{¶ 208} Valentine filed a petition seeking a writ of habeas corpus in the federal district court, which the district court granted based on its finding that "the identical counts in the indictment violated [Valentine's] due process right to be notified of the crime charged with reasonable certainty so that he could fairly protect himself from double jeopardy." *Id.* at 630.

{¶ 209} On appeal, the Sixth Circuit upheld the district court's decision. The Sixth Circuit determined that "an indictment is only sufficient if it (1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges,

and (3) protects the defendant against double jeopardy." *Id.* at 631, citing *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). The court found that Valentine's indictment met the first prong of the *Russell* test by "adequately setting out the elements of the charged offense[s]," but failed to meet the other prongs. *Id.*

{¶ 210} Regarding the notice prong, the court determined that the primary problem was that "within each set of 20 counts, there are absolutely no distinctions made[,]" which led to Valentine being prosecuted for "two criminal acts that occurred twenty times each, rather than for forty separate criminal acts." *Valentine* at 632.

{¶ 211} Regarding the double jeopardy prong, the court found that the indictment and the trial record were insufficiently specific for Valentine to plead his convictions or acquittals as a bar to future prosecutions, and that the undifferentiated counts raised the possibility that Valentine was punished multiple times for the same criminal act. *Id.* at 634-635. First, the court found that it was unclear what limits, if any, would have been placed on the state reindicting Valentine if he had been acquitted of all 40 charges because it was unclear what "factual incidents" were presented to and decided by the jury; thus, "it is not clear to what extent [Valentine] could ably assert that his acquittal barred prosecution for other similar incidents." *Id.* at 635. Because the "carbon-copy counts" of Valentine's indictment would have "complicated" his future assertion of his double jeopardy rights, the Sixth Circuit found that Valentine's due process rights were violated by the defective indictment. *Id.* The court also found that the lack of connection between counts in the indictment and specific instances of conduct presented at trial

created "uncertainty as to what the trial jury actually found," leading to the possibility that Valentine was "'over-convicted'"—i.e., convicted of 20 counts of felonious sexual penetration when there was only evidence to support 15 counts of felonious sexual penetration. *Id.* at 636. The court concluded that due process requires enough specificity in an indictment to protect against this type of double jeopardy, which Valentine's indictment lacked. *Id.*

{¶ 212} After determining that Valentine's indictment was insufficient and his due process rights were violated, the Sixth Circuit went on to note that

[i]mportantly, the constitutional error in this case is traceable not to the generic language of the individual counts of the indictment but to the fact that there was no differentiation among the counts. The exigencies of child abuse cases necessitate considerable latitude in the construction of criminal charges. The prosecutors in this case, however, abused this wide latitude by piling on multiple identical counts. Numerous charges cannot be made out through estimation or inference. * * * Courts cannot uphold multiple convictions when they are unable to discern the evidence that supports each individual conviction.

*Id.* at 636-637. The court also noted that differentiating between counts does not require "overly-burdensome precision" or "exacting specificity," but could be accomplished by using different timeframes, types of offenses, or generic locations. *Id.* at 637.

{¶ 213} Kamer argues that, like the indictment in *Valentine*, his indictment contains absolutely no distinctions between the counts, and the state did not distinguish between the counts by providing a bill of particulars *or* by connecting certain acts of sexual conduct to specific counts in the indictment during the trial. He also contends that, because of this lack of distinction and the fact that he was acquitted of the December 2018 to February 2019 charges, he cannot be retried on the March to July 2019 charges because it is impossible to know *what conduct* forms the basis of his acquittals and, therefore, impossible to know *what conduct* the jury could consider (and convict upon) in a retrial.

{¶ 214} Kamer's argument ignores the temporal distinction within the indictment that separated the acquitted charges from those for which the jury entered a conviction. That is, he was acquitted of four counts of rapes and one count of GSI that were alleged to have occurred "[o]n or about December 1, 2018 to February 28, 2019[,]" and convicted of four counts of rapes and one count of GSI that were alleged to have occurred "[o]n or about March 1, 2019 to July 29, 2019[.]" Furthermore, to the extent that Kamer questions the basis of the jury's verdict, we do not probe the reasoning of the jury, but rather, "'accept the jury's collective judgment' so as to preserve the sanctity of the jury process * * *." *State v. Lovejoy,* 79 Ohio St.3d 440, 448, 683 N.E.2d 1112 (1997), quoting *United States v. Powell,* 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

{¶ 215} Kamer compares the facts of his case to *Shaw,* 2d Dist. Montgomery No. 21880, 2008-Ohio-1317. In *Shaw,* the Second District Court of Appeals reversed

multiple convictions for sex offenses based on improper "other acts" evidence admitted without any limiting instruction. The court also determined that Shaw could not be retried because there was extensive testimony regarding other sexual misconduct beyond the crimes charged in the indictment, Shaw was convicted of only five of the 25 counts he was charged with, and Shaw's convictions and acquittals both related to conduct that was alleged to have occurred within the only time period alleged in the indictment. Ultimately, the appellate court concluded "that while Shaw's indictment was sufficient in that it tracked the language of the statutes, the lack of any differentiation of which facts apply to which charges precludes retrial for any offenses against the same three victims that occurred during the expansive time span covered by the indictment." *Id.* at ¶ 18.

{¶ 216} Kamer argues that *Shaw* is analogous to this case given the "lack of any differentiation of which facts apply to which charges * * *" against him. *Id.* We have reviewed this record carefully, and we agree that there was barely any effort, throughout the entire trial court proceedings, to differentiate between the two time periods of the indictment, or to connect specific conduct to the individual charges. In addition, the trial testimony does not differentiate between the two distinct time periods of the indictment with clarity. Although there was evidence regarding the occurrence of four distinct acts of rape and one act of gross sexual imposition—and, therefore, there is sufficient evidence to sustain the convictions—the state did not clearly establish *when* this abuse occurred or how many times the specific types of abuse occurred. To the contrary, after reviewing the evidence that would "get to four [rape] counts * * *" relative to the

95.

December to February charges, and moving to "the next four counts * * *" of rape, the prosecutor said, "So again, I don't want to go through all of this with you. * * * We've talked about all of that sexual conduct. It's the same thing, the same thing keeps happening again * * *. It's all the same: Bathroom, bedroom, vaginal, anal, anal [sic], digital, oral—same thing." The prosecutor made essentially the same argument regarding the second gross sexual imposition charge.

{¶ 217} But, unlike *Shaw*, Kamer was not acquitted and convicted of crimes that occurred during the same timeframe; he was acquitted of four rapes and one GSI that occurred between December 1, 2018, to February 28, 2019, and convicted of four rapes and one GSI that occurred between March 1, 2019, to July 29, 2019. Under these circumstances, it is possible to determine what evidence the state can (and cannot) present at a retrial—i.e., the state would be limited to conduct occurring within the indictment period (March 1, 2019, to July 29, 2019) and would be precluded from presenting any evidence that cannot clearly be shown to have occurred on or after March 1, 2019.

{¶ 218} Considering the jury's acquittal of charges based on conduct predating March 2019, the lack of evidence placing conduct on a timeline with certainty presents significant issues for the prosecution should the state proceed to a second trial. *Compare State v. Kelley*, 2017-Ohio-4475, 83 N.E.3d 990 (6th Dist.) (state's use of evidence from outside the period listed in the indictment prejudiced appellant). But, at this juncture, Kamer raises nothing more than a "potential for a future Double Jeopardy problem * *

96.

*," which is not "grounds for reversal of a conviction that does not involve a current Double Jeopardy violation." *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 68 (2d Dist.) We lack authority "to issue advisory opinions to prevent future disputes." *State v. Christian,* 184 Ohio App.3d 1, 2009-Ohio-4811, 919 N.E.2d 271, ¶ 24 (7th Dist.), citing *Tuckosh v. Cummings,* 7th Dist. Harrison No. 07 HA 9, 2008-Ohio-5819, ¶ 38; *Reinbolt v. Natl. Fire Ins. Co. of Hartford,* 158 Ohio App.3d 453, 2004-Ohio-4845, 816 N.E.2d 1083, ¶ 13 (6th Dist.).

{¶ 219} Kamer's fourth assignment of error is not well-taken.

### C. Kamer's sixth and seventh assignments of error are moot.

{¶ 220} In his sixth assignment of error, Kamer argues that the cumulative errors made at trial deprived him of a fair trial, and in his seventh assignment of error, he argues that his convictions are against the manifest weight of the evidence. Because we have determined that Kamer's convictions must be reversed and his case remanded for a new trial, his sixth and seventh assignments of error are moot and are not well-taken.

### III.    Conclusion

{¶ 221} Because of the prejudicial nature of the Evid.R. 404(B) testimony from G.K. and the hearsay testimony from Simon and Grieser, and the state's failure to show that the trial court's errors in admitting the testimony were harmless beyond a reasonable doubt, we must vacate Kamer's convictions.

{¶ 222} Accordingly, the November 6, 2020 judgment of the Wood County Court of Common Pleas is reversed, Kamer's convictions are vacated, and the case is remanded

97.

for a new trial on counts 7, 8, 9, 10, and 11.  The state is ordered to pay the costs of this

appeal pursuant to App.R. 24.


Judgment reversed,
and remanded.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                     _____
                                                              JUDGE

Christine E. Mayle, J.

                                                        _____
Gene A. Zmuda, J.                           JUDGE
CONCUR.

                                                        _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.